UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ANNA M. LITIF, individually and
in her capacity as Administratrix
of the Estate of Louis R. Litif
LUANNE LITIF, &
LEE LITIF,
          Plaintiffs,

                                          CIVIL ACTION
          v.                              NO. 02-11791-WGY

UNITED STATES, JOHN MORRIS, &
JOHN CONNOLLY,
          Defendants.

JOHN E. DAVIS AND ROBERT P.
DAVIS, in their capacities as
Administrators of the Estate of
DEBRA DAVIS,
          Plaintiffs,

                                          CIVIL ACTION
          v.                              NO. 02-11911-WGY

UNITED STATES, JOHN MORRIS, &
JOHN CONNOLLY,
          Defendants.

MARION HUSSEY, individually and
in her capacity as Administratrix
of the Estate of Deborah Hussey,
          Plaintiff,

                                          CIVIL ACTION
          v.                              NO. 03-10087-WGY

UNITED STATES, JOHN MORRIS,
JOHN CONNOLLY, JAMES BULGER, &
STEPHEN FLEMMI,
          Defendants.


MEMORANDUM OF DECISION
AND ORDER FOR JUDGMENT

YOUNG, D.J.                               January 29, 2010

## I.   INTRODUCTION

     The harrowing story of the FBI's succor of James J. Bulger,

Stephen J. Flemmi, and their associates (the "Bulger Gang") has

been told by several courts in this District.[1]   In this latest

_____

     [1] See, e.g., United States v. Salemme, 91 F. Supp. 2d 141
(D. Mass. 1999) (Wolf, J.), rev'd in part sub nom. Flemmi v.

and likely last chapter, the families of Louis Litif, Debra
Davis, and Deborah Hussey, seek recovery from the United States
under the Federal Tort Claims Act (the "FTCA"), 28 U.S.C. §§ 2671
et seq.[2]

Despite years of legal wrangling and an extensive factual
record, at its core this is a very simple case.  Federal Bureau
of Investigation ("FBI") agents actively protected a group of
murderers from apprehension and prosecution in order to use them
as informants against La Cosa Nostra.  The agents did this over a
span of nearly twenty years, despite being on notice that their
informants were killers and would, and indeed did, continue to
murder.  Had a private person enabled physical harm in the way
that these agents did, he would be liable in tort under the laws
of the Commonwealth.  Accordingly, the FTCA imposes liability on
the government for the actions of its agents.

_____
United States, 225 F.3d 78 (1st Cir. 2000), cert. denied sub nom.
Flemmi v. United States, 531 U.S. 1170 (2001); McIntyre v. United
States, 447 F. Supp. 2d 54 (D. Mass. 2006) (Lindsay, J.), aff'd,
545 F.3d 27 (1st Cir. 2008); Limone v. United States, 497 F.
Supp. 2d 143 (D. Mass. 2007) (Gertner, J), aff'd, Nos. 08-1327,
08-1328, 579 F.3d 79 (1st Cir. 2009).
        [2] The Plaintiffs have also brought Bivens claims against
officers John Morris and John Connolly.  See Litif Compl. [02-
11791, Doc. No. 1]; Davis Am. Compl. [02-11911 Doc. No. 8];
Hussey Compl. [03-10087 Doc. No. 1].  The Hussey Complaint also
includes state law tort claims against Bulger and Flemmi.  John
Morris refused to appear at trial.  John Connolly is currently
serving a criminal sentence.  See United States v. Connolly, No.
99-10428 (D. Mass. Sept. 16, 2002).  The FTCA portion of the
action was severed by Judge Lindsay before the case was
reassigned to this Court.  See McIntyre v. United States, No. 01-
10408 (D. Mass. May 23, 2006).
        The individual defendants are in default, save for Bulger
upon whom no adequate service has ever been perfected.  These
portions of the three actions are administratively closed.  The
actions against Morris and Connolly may be reopened should
further proceedings absolve the government.  As Flemmi is in
default, the Court adjudicates him jointly and severally liable
with the government to the Estate of Deborah Hussey.

After a brief description of the Plaintiffs and clarifications of certain evidentiary rulings made at trial, the Court will make factual findings and rulings of law pursuant to Federal Rule of Civil Procedure 52(b).  It will then make findings and rulings as to damages.[3]

### A.   The Plaintiffs

Louis Litif was a bookmaker who worked with Bulger and Flemmi.  Litif was indicted for the murder of James Matera in 1979.  Shortly thereafter, he sought to cooperate with the authorities by informing on Bulger and Flemmi.  The pair murdered Litif before he could make any sort of deal with law enforcement. No one was ever indicted for his murder.  Litif was survived by his wife Anne, his daughter Luanne, and his son Lee.  The Estate of Louis Litif and his wife and children (the "Litif family") filed their administrative claim on September 10, 2001, seeking damages for conscious pain and suffering, loss of consortium, loss of net expected income, and intentional infliction of emotional distress damages.

Debra Davis was a paramour of Flemmi's.  The two met around 1971 when Davis was sixteen years old and Flemmi was forty-three. Davis disappeared in 1981 when she was twenty-six years old.  Her body was discovered in October 2000.  Flemmi eventually pled guilty to her murder in 2003.  The Estate of Debra Davis and her mother Olga (the "Davis family") filed an administrative claim

---

[3] The Court rendered its tentative findings and rulings on July 24, 2009 and entered judgment on September 30, 2009. With but a single exception, see infra Part IV.A.2, this opinion amplifies these tentative findings and further explains the legal reasoning behind them.  An amended judgment will enter.

against the United States for conscious pain and suffering, funeral expense damages, and loss of consortium on September 17, 2001.

Deborah Hussey was the daughter of Marion and Thomas Hussey. Marion Hussey left Thomas Hussey and began living with Flemmi when Deborah Hussey was still a minor.  Flemmi sexually abused Deborah Hussey, who was also involved in drug abuse and prostitution prior to her murder.  Deborah Hussey disappeared in 1984.  Her body was found in January of 2000.  Flemmi pled guilty to her murder as well.  The Estate of Deborah Hussey and her mother Marion (the "Hussey family") filed their administrative claim on January 11, 2002.  They are seeking conscious pain and suffering and funeral expense damages.

### B.   Evidentiary Rulings

It is well established that the United States is not subject to offensive, non-mutual collateral estoppel.  See United States v. Mendoza, 464 U.S. 154 (1984).  That is, the Plaintiffs in this case cannot use the decisions in McIntyre or Limone conclusively to establish facts.  Nonetheless, it is within the sound discretion of this Court to manage the cases before it efficiently.  See, e.g., Brockton Sav. Bank v. Peat, Marwick, Mitchell & Co., 771 F.2d 5, 11 (1st Cir. 1985); Fed. R. Civ. P. 83(b).  To accomplish this task, the Court issued a case management order treating the factual findings of the following cases as requests for admission: McIntyre v. United States, No. 01-10408, slip. op. (D. Mass. Sept. 5, 2006) [Doc. No. 204, Exs. A-C]; Limone v. United States, No. 02-10890, slip. op. (D. Mass.

4

July 26, 2007) [Doc. No. 204, Exs. F-H]; <u>Estate of Castucci</u> v. <u>United States</u>, No. 02-11312 (D. Mass. March 31, 2008) [Doc. No. 204, Ex. E]; <u>Estate of Halloran</u> v. <u>United States</u>, No. 01-11346 (D. Mass. Nov. 19, 2007) [Doc. No. 204, Exs. F-H]; and <u>Estate of Donahue</u> v. <u>United States</u>, No. 01-10433 (D. Mass. Nov. 19, 2007) [Doc. No. 204, Exs. F-H].[4]  <u>See</u> Order dated June 22, 2009; [Doc. Nos. 188-189, 204].  Thus, any findings in those decisions not specifically denied by the government in its submission are treated as admitted.  The Court reiterated its view of these admissions when it issued its tentative findings and rulings at the close of trial.  Trial Tr. vol. 12, 27:20-23, July 24, 2009 ("[T]o the extent that I am warranted in finding as my colleagues have found in those other cases, I make the same findings in the same manner and to the same extent as my colleagues made.").  This case management practice served its purpose in narrowing the issues for trial.  Citations to <u>McIntyre</u> and <u>Limone</u> in the findings that follow should therefore be treated as admissions of the United States.

The evidentiary record in this case is also replete with statements of which the United States has manifested a belief in their truth.  Under Federal Rule of Evidence 801(d)(2)(B) and <u>United States</u> v. <u>Kattar</u>, 840 F.2d 118, 130-31 (1st Cir. 1988), statements of federal prosecutors can be treated as party

---

[4] These five cases are all FTCA cases arising out of the relationship between the Boston FBI and its informants.  Unless otherwise noted, all docket numbers refer to the docket in the Litif case, No. 02-11791.  References hereinafter to the factual findings of <u>McIntyre</u>, <u>Limone</u>, <u>Castucci</u>, <u>Halloran</u>, and <u>Donahue</u>, will be denoted by the case name and page number of the accompanying order or transcript just cited.

admissions against the United States.  Prosecutorial statements
that have come in evidence in this case include: the Agreed
Statement of Facts ("Statement of Facts") from Flemmi's criminal
prosecution, Trial Ex. 50; Kevin Weeks' Superseding Information
and the Government's Motion for Downward Departure, Trial Exs.
27-28; and the Stipulation of Criminal Activities from John
Connolly's racketeering prosecution, Trial Ex. 47.

Finally, several statements in evidence were made by
deceased persons, e.g., the murdered informant Brian Halloran or
the late federal prosecutor, Jeremiah O'Sullivan.  These
statements present a thorny problem involving both federalism and
evidence law.  The statement of a deceased person must overcome
two evidentiary hurdles before it can be admitted: competency and
hearsay.  It must also fall within the ambit of Federal Rule of
Evidence 601, which incorporates state competency law "with
respect to an element of a claim or defense as to which State law
supplies the rule of decision."

At common law, interested parties were not considered
competent to testify.  Although this rule was repealed, a vestige
of it survives in various so-called "Dead Man's statutes."
Essentially, these statutes preserve the competency
disqualification where transactions with a deceased person are at
issue, due to concerns that such situations are especially ripe
for perjurious testimony.  See 3 Jack B. Weinstein & Margaret A.
Berger, Weinstein's Federal Evidence § 601.05[1][a] (2d ed.
2009).

6

In Massachusetts, however, the repeal of the interested party bar was complete. The statement of a deceased person was considered competent evidence provided that it met the general competency requirements for all testimony: personal knowledge and good faith. Of course, the hearsay rule also usually limited a witness from testifying to the statement of a deceased person. This bar too was removed in Massachusetts. "In any action or other civil judicial proceeding, a declaration of a deceased person shall not be inadmissible in evidence as hearsay . . . if the court finds that it is made in good faith and upon the personal knowledge of the declarant." Mass. Gen. Laws ch. 233, § 65. Accordingly, although the language of section 65 is couched in terms of admissibility and hearsay, its requirements for personal knowledge and good faith ought be read as addressing competency. See Hasey v. City of Boston, 228 Mass. 516, 518 (1917) (noting that "the purpose of the statute . . . was plainly to safeguard against the natural weakness of hearsay testimony, as also to make futile the temptation . . . to introduce . . . *testimony which would not be competent* were the declarant living at the trial") (emphasis added). See also 19 William G. Young, John R. Pollets, & Christopher Poreda, Massachusetts Practice, Evidence § 601.2 (2d ed. 1998) (explaining that section 65 ought "be seen as a limitation on the competency of witnesses" to ensure "that the risks involved in allowing what would be classic hearsay" do not outweigh the loss of "evidence through the death of those witnesses").[5]

---

[5] The first - unofficial - compilation of Massachusetts statutes and caselaw along the lines of the Federal Rules of

Viewing section 65 in this fashion, the next question is whether the state-law component of an FTCA action falls within the ambit of Rule 601.  Cf. Donovan v. Sears Roebuck & Co., 849 F. Supp. 86, 88 (D. Mass. 1994) (Lindsay, J.) (construing section 65 narrowly as addressing only hearsay, not competency, and holding that it had no application in federal court).  When Congress adopted Rule 601, it sought to recognize the different state-law approaches to the competency of statements of a deceased person "with respect to an element of a claim or defense as to which State law supplies the rule of decision."  Thus, in states like Massachusetts, where the hearsay bar against the statements of deceased persons has been removed, "the effect . . . should be to permit hearsay to be introduced that would not

---

Evidence confirms the understanding that the Massachusetts statute concerning the declarations of deceased persons is primarily a rule of competence by setting it forth with other competence rules in Article VI.  See, e.g., William G. Young, John R. Pollets, & Christopher Poreda, Massachusetts Evidentiary Standards Stand. 601(b) (2008).  Unfortunately, in today's official Massachusetts Guide to Evidence, the same statute is classified and referred to as simply another hearsay exception.  See Massachusetts Guide to Evidence § 804(b)(5)(A) (2008-2009) [hereinafter Mass. G. Evid.] and Advisory Committee notes to this section and section 802.  Even the Annotated Guide to Massachusetts Evidence now speaks only to the declaration of deceased persons as being a hearsay objection.  See William G. Young, John R. Pollets, & Christopher Poreda, Annotated Guide to Massachusetts Evidence § 804(b)(5)(A) (2009) and n.13 to this section.  None of these sources have the force of law or the authority of decisions of the Massachusetts Supreme Judicial Court, see Mass. G. Evid., Statement of the Supreme Judicial Court and Introduction (Oct. 2008) (Guide "is not to be interpreted as an adoption of a set of rules of evidence, nor a predictive guide to the development of the common law of evidence.").  Still, words matter and the present misclassification of the statute regarding statements of deceased persons could blur its actual historic antecedents and, at least in the federal courts, deprive the fact-finder of otherwise competent evidence in diversity and FTCA cases.

otherwise be admissible under Article VIII of the Rules."  3
<u>Weinstein's Federal Evidence</u>, § 601.05[1][c].

Does state law, however, supply the rule of decision when it
is not applied directly, as in a diversity case, but incorporated
into a federal statute, like the FTCA?  "Congressional intent in
this area is simply unclear."  27 Charles Alan Wright & Victor
James Gold, <u>Federal Practice and Procedure</u> § 6007 (2d ed. 2007).

The legislative history of the operative phrase in Rule 601
is not decisive.  On one hand, the initial House Report
commenting on similar language in Rule 501, states that the
language was "designed to require the application of State
privilege law in civil actions and proceedings governed by <u>Erie</u>
<u>R. Co.</u> v. <u>Tompkins</u>, 304 U.S. 64 (1938)."  H.R. Rep. 93-650
(1973), <u>as reprinted in</u> 1974 U.S.C.C.A.N. 7075, 7082.  To the
same effect, the Conference Report states that: "If an item of
proof tends to support or defeat a claim or defense, or an
element of a claim or defense, and if state law supplies the rule
of decision for that claim or defense, then state competency law
applies to that item of proof."  H.R. Rep. No. 93-1597 (1974)
(Conf. Rep.), <u>as reprinted in</u> 1974 U.S.C.C.A.N. 7098, 7101-7102.
Thus, the Conference Report appears to require using state
competency rules whenever federal law incorporates state law as
an element of a federal claim.  On the other hand, the Conference
Report also references the similar language in Rule 501.
Endorsing that language, it states:

> In those situations where a federal court adopts or
> incorporates state law to fill interstices or gaps in
> federal statutory phrases, the court generally will apply
> federal privilege law. . . . When a federal court chooses

> to absorb state law, it is applying the state law as a matter of federal common law.  Thus, state law does not supply the rule of decision (even though the federal court may apply a rule derived from state decisions), and state privilege law would not apply.

H.R. Rep. No. 93-1597 (1974) (Conf. Rep.), <u>as reprinted in</u> 1974 U.S.C.C.A.N. 7098, 7101.  The legislative history is directed at issues regarding <u>Erie</u> and federal common law.  It describes how federal common law can incorporate state law without triggering the state "substantive" (in <u>Erie's</u> terms) law of competency.  But it does not directly address the different situation where a federal statute directs a federal court to incorporate state law. Allowing for liability "in accordance with the law of the place" as the FTCA does, 28 U.S.C. § 1346(b)(1), is not an instruction to develop federal common law.[6]  Perhaps the only helpful language in the Conference Report is the qualifier: "generally." Such a qualifier indicates "that Congress recognized that state competency law would apply in at least some cases in which the jurisdiction of the court was premised on some federal interest. Perhaps Congress was thinking of instances where it has explicitly directed the use of state substantive law."  27 <u>Federal Practice and Procedure</u> § 6007.

Although some courts have applied Rule 601 in FTCA cases without much analysis, <u>see, e.g.</u>, <u>Trevino</u> v. <u>United States</u>, 804 F.2d 1512, 1516 (9th Cir. 1986); <u>Bearce</u> v. <u>United States</u>, 433 F. Supp. 549, 553 (N.D. Ill. 1977), when it comes to Rule 501, the

---

[6] It is a semantic stretch to argue that the FTCA's use of state law is a kind of federal common law for purposes of Rule 501 or 601, as the most basic definition of common law is: "The body of law derived from *judicial decisions*, rather than from statutes and constitutions."  <u>Black's Law Dictionary</u> 313 (9th ed. 2009) (emphasis added).

trend has been to disregard state privilege law in FTCA cases,
see Tucker v. United States, 143 F. Supp. 2d 619, 623-27 (S.D.W.
Va. 2001).

Against this muddy backdrop, this Court rules that for two
principal reasons, Massachusetts competency law *should* apply to
this FTCA action.  First, its application in this case fits
within the plain language of Rule 601.  One element of a
successful FTCA claim is a successful state law claim.  Thus,
state law supplies the rule of decision as to this element of the
FTCA claim.  Second, as a waiver of sovereign immunity, the FTCA
should return the action, as near as statutorily warranted, to
what it would have been had the immunity not been present in the
first instance.  Were it not for sovereign immunity, these
Plaintiffs would have brought an action against the United States
in tort under the laws of the Commonwealth, including its
competency laws.  Sovereign immunity bars that lawsuit from going
forward.  Fine.  But once sovereign immunity has been partially
waived, and the lawsuit goes forward "in accordance with the law
of the place," why shouldn't the lawsuit use the competency "law
of the place," especially when there is reason to think that
Congress has categorized that competency law as substantive for
Erie purposes?  The statements of deceased persons were thus
admitted at trial where proper under state law and will therefore
be considered in the findings that follow.

## II.   FINDINGS OF FACT

### A.   The FBI's Relationship with Flemmi and Bulger

The FBI's relationship with Flemmi dates back to the 1964, when FBI agent H. Paul Rico opened Flemmi as an informant. McIntyre, 29 n.35.  Bulger was opened as an informant in 1971. Id.  Their recruitment as informants was not an accident.  The FBI had made the prosecution of organized crime and La Cosa Nostra its top priority.  McIntyre, 11; Limone, 20.  To that end, J. Edgar Hoover himself inaugurated the Top Echelon Criminal Informant Program on June 21, 1961.  Top echelon informants were defined as those "that would be able to provide high-level information on a major scale."  Limone, 23.  Rico was assigned exclusively to the development of top echelon informants. Limone, 23 n.25.  Both Flemmi and Bulger were designated as top echelon informants.

In 1969, Flemmi was indicted, along with Francis Salemme, for the murder of Edward "Wimpy" Bennett, head of a criminal gang, and the attempted murder of attorney John Fitzgerald, who represented Joseph Barboza (Barboza himself was a La Cosa Nostra member turned government witness).  Ultimately Salemme was convicted of these charges and spent ten years in prison.  See McIntyre, 38-39; Limone, 32-33.  Flemmi, by contrast, eluded capture.  Flemmi's testimony establishes that Rico tipped him off about the impending indictment, allowing him to flee and avoid prosecution.  The unavoidable inference that flows from Rico's conduct in tipping off Flemmi has already been drawn by Judge Mark L. Wolf:

12

It is clear to me that Mr. Flemmi would have either been killed or in prison like Frank Salemme if Paul Rico had not tipped him off and encouraged him to flee just before Mr. Flemmi was indicted for the bombing of John Fitzgerald and the murder of Walter Bennett. . . . [I]f Mr. Flemmi had been prosecuted in 1969 for the Fitzgerald bombing or the William Bennett murder, his role as an FBI informant might have been disclosed and examined more than 30 years ago.  But Mr. Rico prevented that from happening.

Trial Ex. 12A (<u>United States</u> v. <u>Flemmi</u>, No. 94-10287, Sentencing Hr'g Tr. 8-9, Aug. 21, 2001).  This Court reaches the same conclusion, based solely on Flemmi's testimony at trial. Moreover, Rico tipped off Flemmi even though he had intelligence information that Flemmi was guilty of the Bennett murder.  Trial Ex. 102.  During this period, Rico received numerous incentive awards, quality pay increases, and letters of congratulations from J. Edgar Hoover.  Trial Ex. 77.

Flemmi returned to Boston in 1974, after Rico told Flemmi it was safe to do so.  Flemmi immediately became involved in a string of murders — James Sousa, Edward Connors, Thomas King, and Richard Castucci — between October 1974 and December 1976. Statement of Facts ¶¶ 1-4.  Nonetheless, FBI Agent John Connolly, now Flemmi's handler due to Rico's retirement, <u>see</u> <u>McIntyre</u>, 39, continued to provide information to Bulger and Flemmi that enabled the two of them to remain free and continue their crime spree.  For example, Connolly warned the Bulger Gang to "back off" an attempted extortion that could have resulted in a criminal investigation.  The Bulger Gang had targeted a vending machine company in South Boston in 1975, but a resultant lawsuit

put pressure on the FBI to rein them in.  Trial Ex. 107.
Connolly's warning helped the Bulger Gang avoid an investigation.

The string of murders included the murder of an FBI
informant named Richard Castucci.  This Court concurs with Judge
Lindsay's findings regarding that murder.  <u>Estate of Richard
Castucci</u> v. <u>United States</u>, No. 02-11312, Order Granting Pls.'
Mot. Summ. J., Mar. 31, 2008.  The  parties do not dispute that:
(1) Castucci was a bookmaker who did business with Bulger and
Flemmi; (2) he was a top echelon informant for the FBI; (3) and
in the weeks before his murder he was feeding the FBI
intelligence regarding the whereabouts of Joseph McDonald and
James Sims, two members of the Bulger Gang on the lam.  <u>McIntyre</u>,
39; Trial Ex. 40.  Shortly before Castucci's murder, Connolly
told Bulger that Castucci had disclosed the whereabouts of
McDonald and Sims.  As a result of this disclosure, Bulger and
Flemmi decided to murder Castucci.  Statement of Facts ¶ 4.
While there is evidence that Castucci owed money to Bulger and
Flemmi, the timing of his murder as well as Flemmi's testimony
that the murder was tied to Castucci's informant activities
establish that the debt was not the primary cause of Castucci's
demise.  In the weeks after his murder, the FBI office received
intelligence information indicating the Bulger Gang was
responsible.  Trial Ex. 40 at MCN029-1612.

Despite the mounting body count, Connolly continued to
ensure that Bulger and Flemmi stayed out of jail.  In 1979, an
indictment was being prepared during the prosecution of a race-
fixing scheme involving Howard Winter and his gang, of which

14

Bulger and Flemmi were members.  Connolly and his supervisor,
John Morris, approached the prosecutor, Jeremiah O'Sullivan,
chief of the federal Organized Crime Strike Force, and asked that
Bulger and Flemmi be removed from the indictment.  Trial Ex. 115.
Although O'Sullivan vociferously denied being influenced by this
overture, all the other participants — Morris, Connolly, Bulger,
Flemmi — contend that he was.  At the very least, as O'Sullivan
did admit, he first learned at that time that Bulger and Flemmi
were top echelon informants.  Trial Ex. 85 at 303.  Morris and
Connolly's request was thus a substantial factor, if not the sole
reason, that Bulger and Flemmi avoided indictment in the race-
fixing case.  The FBI needed to keep its informants out of jail
for them to be of value.

    In exchange for helping Flemmi and Bulger avoid indictment,
Connolly requested that the pair not murder the cooperating
witness in the race-fixing case, Anthony Ciulla.  This was not
the only time Connolly requested that Bulger and Flemmi spare an
FBI informant.  Flemmi also testified that in the late 1970's,
Connolly requested that the pair refrain from killing a noted
gangster because this gangster was an FBI informant.[7]  They
agreed to back down.  Were it not for Connolly's request that
they spare him, Ciulla might have been the second informant,
after Castucci, to be killed.  As it turned out, that second
informant was Louis Litif.

---

[7] This gangster's name is subject to a protective order.

**B.    The Murder of Louis Litif**

Litif was murdered in April of 1980.  Agreed Facts ¶ 24
[Doc. No. 178].  Since 1976, he had been a top echelon informant
for the FBI, with Connolly as his handler.  Trial Ex. 30 at
MCN070-0053, MCN070-0063.  Litif's informant file refers to him
as a bookmaker with ties to organized crime.  Trial Ex. 30 at
MCN070-0104.  In September of 1979, Litif was charged with the
murder of James Matera and released on bail.  Pls. Litifs' Trial
Brief, Ex. 1 (July 8, 2009) [Doc. No. 216, Ex. 1].  As result of
this charge, Litif was closed as an informant.  Trial Ex. 30 at
MCN070-0020.  While Litif was out on bail, he approached an
attorney, Kevin Curry, to seek advice about potential cooperation
with the district attorney's office.  Litif offered to
incriminate Bulger and others in a drug scheme.  Curry in turn
approached Boston Police Detective Edward Walsh to share this
information.  John Connolly, who was not known to Curry at the
time, was also there.  In the presence of Connolly, Curry related
to Walsh what Litif said about Litif's willingness to incriminate
Bulger.  Three weeks later, Bulger and his accomplices murdered
Litif.

The Court infers that Connolly leaked to Bulger Litif's
willingness to incriminate Bulger and that the murderous result
of this leak was well within the foreseeable risk created by
Connolly's conduct.  Several pieces of evidence, taken together,
mandate this conclusion: Curry's testimony (which the Court finds
credible); Connolly and Walsh's relationship, Trial Ex. 57 at
MCN003-0461, MCN003-0462 (subject to protective order);

16

Connolly's leak of Castucci's cooperation; Connolly's later leaks of other informants' status, leading them to a similar fate;[8] and Bulger's statement to Weeks and Flemmi, made shortly after the murder, that Litif was an informant.  This leak was in violation of agency guidelines then in effect.  Trial Ex. 36 at MCN004-8468.

As to the manner of Litif's murder, the statement to the FBI of the deceased Brian Halloran, establishes that Litif was lured to the Triple O bar where Bulger and an associate ambushed him. The autopsy report as well as expert testimony show that Litif was stabbed dozens of times with an ice-pick-like implement before he was shot in the back of the neck.  Trial Ex. 21 at MCN025-0422-MCN025-0424.  Certain of the puncture wounds perforated Litif's liver, a wound thought to cause exquisite agony.[9]

Litif's body was placed in the trunk of his car.  Luanne Litif, called to the scene after the discovery of Litif's body, testified that although she looked into the trunk, she did not notice anything wrong, apparently failing to notice her father's body.

### C.   The FBI Continues to Protect Bulger and Flemmi

Suspecting that the FBI had been compromised, the Massachusetts State Police stepped into the breach and decided to

---

[8] See infra, Part II.E.

[9] The evidence to support the theory that Litif's murder took more than several minutes is insufficient.  A neck wound, Trial Ex. 21, plus Weeks' incredible testimony regarding Litif's last words, do not prove by a preponderance of the evidence that Litif was restrained, interrogated, and tortured, as the Litif family suggests, Pls. Litifs' Post-Trial Brief (Aug. 17, 2009) [Doc. No. 250].

wiretap the Lancaster Street Garage, a place where the Bulger
Gang and others often conducted criminal activities.  The recent
murders and violent past of the Bulger Gang did not give Connolly
pause: he leaked the existence of the wiretap to Bulger.
Increased scrutiny followed this leak, and the FBI was forced to
justify its continued use of Bulger and Flemmi as informants.  In
memos dated December 2, 1980, Trial Exs. 88-89, and April 1,
1981, Trial Exs. 45-46, Connolly recounted all the information
that Bulger and Flemmi had provided over the years: information
that led to the indictment of La Cosa Nostra members, increased
the safety of undercover agents, formed the basis for wiretaps
against La Cosa Nostra, and solved numerous crimes.  Of Bulger,
Connolly wrote:

> In my several years in the Boston Office, I have
> actively worked 16 informants, having developed 11 of
> these sources myself and have been commended by the
> Director of the FBI for my work with informants.
> It is my considered opinion that this source is the
> type of source that we should be trying to develop in
> accordance with Bureau instructions and consistent with
> Attorney General guidelines. This
> particular source is one of the highest caliber sources
> in the Division within recent memory.

Trial Ex. 89 at MCN004-8386.

John Morris added to the memo: "The closing of an informant
of this caliber would deal a serious blow to the [Organized Crime
Program] of the Boston Division." Id.  The role that Bulger and
Flemmi played in furthering the institutional interests of the
FBI, and the corresponding protection they received, could not be
any clearer.

### D.   The Murder of Debra Davis

In September 1981, five months after the FBI redoubled its commitment to Bulger and Flemmi, the pair murdered Flemmi's girlfriend of nearly ten years, Debra Davis.  Flemmi had Davis murdered because after their lengthy liason, Davis showed an inclination to get on with her life (without Flemmi) and had displayed an interest in another man.  Olga Davis Dep. at 78:7-86:8, December 21, 2004.  Flemmi himself testified that it was Bulger who wanted Davis murdered because he was jealous of Flemmi and Davis, and feared she knew of Flemmi's relationship with Connolly.  These, however, are the vapid maunderings of a supremely evil old man.  Flemmi had Davis murdered for that most common and banal reason underlying male domestic violence against women: Flemmi thought he "controlled" Davis.  Flemmi's testimony on this matter is not credible.

Flemmi lured Davis to Bulger's mother's house in South Boston.  Bulger, lying in wait, grabbed her and scissored her neck between his forearms in order to crush her windpipe.[10]  As

---

[10] No witness testified to this level of detail concerning the strangulation of Davis.  The Court draws this inference from Weeks' description (and illustrative gestures) of the strangulation of Deborah Hussey for which he was present.  The Court infers that when Bulger strangled his victims by hand, he did so in a roughly uniform fashion.

Flemmi watched, Bulger strangled her.[11]  Davis lost consciousness within a few minutes and died.

### E.  Between the Davis & Hussey Murders

Starting several months before the murder of Davis and continuing for several years afterward, the Bulger Gang went on a killing spree of sorts, committing at least six murders.  Four of the murders related to a particular scheme involving the World Jai Alai company.[12]  This scheme and the murders it spawned were described in great detail by Judge Lindsay in <u>McIntyre</u> and do not warrant repeating here.  <u>McIntyre</u>, 43-64.  In addition, the Bulger Gang murdered John McIntyre, an informant, and Arthur Barrett, a thief and drug dealer.  <u>McIntyre</u>, 73-83; Statement of Facts ¶¶ 8-9.  Although two of these six victims were informants (McIntyre and Halloran), the rest were not.

Despite the rising body count, Connolly continued to protect Bulger and Flemmi.  In the investigation into the four World Jai Alai murders, out-of-state law enforcement worried that the relationship between the Bulger Gang and the Boston FBI hindered

---

[11] Weeks' more lurid description of Davis' murder, which he claimed to have received from Bulger, replete with duct tape bondage and a ghoulish blessing from Flemmi, "You're going to a better place," is not credible.  The Court recognizes that this version is adopted as factual in <u>Davis</u> v. <u>Flemmi</u>, No. 01-282 (Norfolk Super. Ct. Sept. 11, 2009) (Brady, J.).  That case is but an assessment of damages following Flemmi's default.  In making such an assessment, the court necessarily accepted as true all the well pleaded facts, focusing instead on the assessment of damages.  <u>Multi Tech., Inc.</u> v. <u>Mitchell Mgmt. Sys., Inc.</u>, 25 Mass. App. Ct. 333, 334-35 (1988) (citing <u>Productura e Importadora de Papel, S.A. de C.V.</u> v. <u>Fleming</u>, 376 Mass. 826, 833-35 (1978).  The present case, in contrast, involved a full trial as to liability.

[12] Roger Wheeler and John Callahan worked for World Jai Alai.  Brian Halloran was an informant with knowledge of the World Jai Alai murders.  Michael Donahue was the unfortunate companion of Halloran when Halloran was gunned down.

the investigation.  These agencies also noted that the Bulger Gang was the primary suspect in the murders.  Trial Ex. 59.  When out-of-state law enforcement asked the Boston FBI to check its files for contacts with Bulger or Flemmi on the dates of the Wheeler and Callahan murders, Connolly provided an alibi.  He drafted a memo stating that he had spoken with Bulger the night of the Wheeler murder and that Bulger was with a female companion at a hotel on the night of the Callahan murder.  Trial Ex. 65.

Connolly's activities during this period increased his standing in the FBI.  In 1983, Morris wrote of Connolly: "His performance has been, and is expected to continue, at a level to which all should aspire to attain, but few will realistically reach."  Trial Ex. 57 at MCN003-0068.  In the same year, Connolly was recommended for an increase in salary on the basis of his performance.  <u>Id.</u>  But it wasn't just the FBI that was paying Connolly.  Starting as early as 1979, Connolly received "Christmas" and "vacation" money from Bulger and Flemmi.  Over his career, Connolly accepted approximately $200,000 from the pair.  Trial Ex. 66.

### F.    The Murder of Deborah Hussey

If Flemmi's relationship with the FBI was going swimmingly, his domestic life was another matter.  Flemmi began living with Marion Hussey, Deborah Hussey's mother, and Deborah herself when Deborah was still a child.  When Deborah was a teenage minor, Flemmi began to abuse her sexually.  Likely as a result of this abuse, Hussey led a troubled life, turning to drug abuse and prostitution.  In late 1984, Hussey informed her mother of

Flemmi's abuse.   As a result, her mother asked Flemmi to move out of the house.

Deborah Hussey herself was proving an inconvenience to both Flemmi and Bulger.   Hussey was relying on their reputation in South Boston to get her out of scrapes arising from her drug abuse and prostitution.   As a result, Flemmi and Bulger killed her.   Statement of Facts ¶ 10.   They murdered her in much the same way they murdered their other victims, by luring her into a house and strangling her.   Here again, Bulger grabbed Deborah Hussey from behind and scissored her neck between his forearms to crush her windpipe.   Hussey fought desperately for her life and knocked Bulger over.   When the two fell to the floor, Bulger jack-knifed his body to work his legs around Hussey's body to crush her torso.   The Court infers Hussey lost consciousness from asphyxiation and died within a few minutes.

### G.   Knowledge of the Murders & the FBI's Role

Despite years of media speculation, the publicly available information regarding the murders at issue and the FBI's role in those murders never went beyond innuendo until Weeks and Flemmi started to cooperate with authorities.   Nor did the family members of these murder victims possess anything beyond mere suspicion regarding the demise of their loved ones and the government's role in that demise.

Curry's narrative of Litif's murder became public in late 1998, when Curry apparently spoke with a reporter at the Boston Herald.   The Herald published an article offering a précis of Curry's testimony, stating that Litif was facing murder charges

and contemplated testifying against Bulger, that this information
was divulged to Walsh and then to Connolly, and that Litif was
killed shortly thereafter.  The article also mentioned that
Halloran had fingered Bulger in Litif's murder.  Ralph Ranalli,
Questions Arise over FBI Agent's Knowledge of Slaying, Boston
Herald, Aug. 5, 1998, available at 1998 WLNR 278441; Trial Ex.
113.  The next day, the Herald reported Walsh's and Connolly's
denial of these allegations.  The Herald also reported Connolly's
statement that Litif was an informant and Connolly was his
handler.  Ralph Ranalli, Ex-FBI Agent Says Slain Dealer Was
Informer, Boston Herald, Aug. 6, 1998, available at 1998 WLNR
258174; Trial Ex. 113.  Nonetheless, there is no evidence that
the Litif family knew of these revelations or would have had
reason to believe them given the official denials until the
circumstances surrounding the murders of other informants became
public and Weeks and Flemmi were able to corroborate Bulger's
role in the murder.

    The day after he murdered Debra Davis, Flemmi visited her
mother, Olga Davis.  He professed to know nothing of her
disappearance and to be actively looking for her.  He received
consolation for his loss from Olga Davis.  He also led the Davis
family to believe that Debra was in Houston, Texas.  A year after
she was reported missing, Debra Davis was removed from the
missing persons database with a notation that she might be in
Houston.  Flemmi remained in regular contact with the Davis
family until his arrest in 1995.  Of course the manner of Debra's
disappearance — she was on her way to meet Flemmi and he later

answered her beeper when her mother called — and knowledge of Flemmi's violent capabilities would have raised suspicion in any reasonable person that Flemmi was involved in her murder.  It is not surprising that Debra's brother Victor was strongly suspicious of Flemmi.  Olga Davis Dep. 111:5-112:21.  That Victor turned out to be correct, however, does not change the fact that his suspicions were just that, suspicions.

The Hussey family too, never had anything more than speculation as to the exact role of Flemmi and the FBI in Deborah's demise.  In approximately 1985, Marion had a confrontation with Flemmi when the two were visiting their son who had been hospitalized.  She accused him of killing Deborah Hussey.  Flemmi denied it.  Marion Hussey Dep. 128-29; Trial Ex. 101 at 14-16.  This was a cruel accusation made at a time of vulnerability, and does not prove that Marion had any inside knowledge.  Marion also speculated that Deborah was living in California under an assumed name.  After Deborah disappeared, Marion was contacted by an unidentified female from California and two local detectives, all of whom indicated that Marion's other daughter Stephanie, was having an affair with a man in California and tried to help that man kidnap his daughter. Because Stephanie could not have been in California at the time, Marion guessed that Deborah might be living in California under an assumed name.  Deborah was listed as a surviving sibling when one of Marion's other daughters died.  Trial Ex. 73.

For Davis and Hussey, conjecture turned to knowledge only when Kevin Weeks began to cooperate with authorities in late 1999

and early 2000.  Weeks' debriefing began in late December 1999.
On January 14, 2000, Hussey's body was recovered.  Marion Hussey
was notified the same day.  Weeks also provided the first
independent corroboration of Davis' murder.  Davis' body was not
recovered until October 2000.  Flemmi was not indicted for the
murders of Davis and Hussey until September 27, 2000.  Additional
information came to light when the FBI first began to release
information about the wrongfully convicted individuals in the
Limone case in December of 2000.  Trial Ex. 91.

**III. RULINGS OF LAW**

There are several elements of an FTCA claim.  The United
States is only liable when: (1) its employees, acting within
their scope of employment, (2) caused personal injury or death,
(3) by negligent or wrongful acts or omissions, (4) in
circumstances where the United States, if a private person, would
be liable to the claimant in accordance with the law of the place
where the act or omission occurred.  28 U.S.C. § 1346(b)(1).  The
law of the place in this case is the Massachusetts Wrongful Death
Act, Mass. Gen. Laws ch. 229, § 2, which provides for recovery
when a person causes the death of another through negligence.
"To prevail on a negligence claim, a plaintiff must prove that
the defendant owed the plaintiff a duty of reasonable care, that
the defendant breached this duty, that damage resulted, and that
there was a causal relation between the breach of the duty and
the damage."  Jupin v. Kask, 447 Mass. 141, 146 (2006).

## A.    Liability for Litif[13]

The duty of care at issue for the murder of Litif is perhaps
the most basic one: "As a general principle of tort law, every
actor has a duty to exercise reasonable care to avoid physical
harm to others." Remy v. MacDonald, 440 Mass. 675, 677 (2004).
One particular manifestation of this duty occurs when "the actor
realizes or should realize that [his act] involves an
unreasonable risk of harm to another through the conduct of . . .
a third person which is intended to cause harm . . . . 'even
though [the third person's] conduct is criminal.'" Jupin, 447
Mass. at 148 (citing Restatement (Second) of Torts § 302B
(1965)).  This duty does not depend on any special relationship
between the FBI and Bulger and Flemmi, on the one hand, or Litif,
on the other.  "It is simply the duty that one person owes to
another to act with care when he knows or should know that his
action poses an unreasonable risk of harm to the other through
the intentional conduct of a third person." McIntyre, 447 F.
Supp. 2d at 107.  One element of this duty is that "the risk of
harm . . . be recognizable or foreseeable to the actor." Jupin,
447 Mass. at 147.

Based on the factual findings in this case, there is no
question that Connolly had a duty of care, breached it, and by
breaching it, created a foreseeable risk of injury to Litif.

---

[13] The same basic framework for liability regarding the
murder of Louis Litif was applied by Judge Lindsay, with the same
results, in McIntyre v. United States, 447 F. Supp. 2d 54 (D.
Mass. 2006), aff'd, 545 F.3d 27 (1st Cir. 2008), Estate of
Castucci v. United States, No. 02-11312 (D. Mass. Mar. 31, 2008),
and the consolidated cases of Estate of Donahue v. United States,
No. 01-10433 (D. Mass. Nov. 19, 2007) and Estate of Halloran v.
United States, No. 01-11346 (D. Mass. Nov. 19, 2007).

Castucci already had been murdered as a result of Connolly's leak of Castucci's informant status.  It therefore strains credulity to argue that a reasonable person in Connolly's position would not foresee what would happen to Litif once he leaked to Bulger information about Litif's desire to incriminate Bulger.  Doing so was an obvious breach of the general duty of care not to cause foreseeable harm to others through the criminal acts of a third person, a breach that caused Litif's death.

**B.   Liability for Davis & Hussey**

While the Litif murder was foreseeably brought about by Connolly's leak, the murders of Davis and Hussey present more complicated issues regarding foreseeability.  The record does not demonstrate that Connolly reasonably should have known that Davis and Hussey particularly, rather than anyone else who happened to cross paths with Bulger and Flemmi, would be harmed.  There is also not one specific act, such as a leak, that led to these acts of violence.  Instead, there was a pattern of conduct lasting over a decade that kept Bulger and Flemmi out on the streets and able to commit violent crimes.

For liability to attach, the injury must be "within the scope of the foreseeable risk arising from the negligent conduct."  Leavitt v. Brockton Hosp., Inc., 454 Mass. 37, 45 (2009).  An actor should be held liable only for harm that was among the potential harms — the risks — that made the actor's conduct tortious.  Id. at 45, n.20 (citing approvingly Restatement (Third) of Torts § 29 cmt. j, at 594 (Proposed Final Draft No. 1, 2005)).  Such a limit avoids "what might be

unjustified or enormous liability by confining liability's scope
to the reasons for holding the actor liable in the first place."
Id. at 47 (quoting Restatement (Third) of Torts § 29 cmt. d, at
579-80).

The fact pattern in Leavitt is illustrative.  A hospital, in
violation of its policy, released a patient who had taken
sedatives and anesthetics without an escort.  The patient
meandered home and was struck by a car.  The police were called.
While racing to the scene of the accident, the police cruiser was
hit by another vehicle, permanently injuring the police officer.
The officer seeks to recover from the hospital, but he cannot.
The harm to the officer is not the type of risk that made the
hospital's conduct negligent in the first instance.  Leavitt, 454
Mass. at 38-39, 44-46.

Contrast Leavitt with Jupin v. Kask, 447 Mass. 141 (2006).
Kask, a homeowner, lived with a man named Rivers, who had a gun
collection he stored in Kask's basement.  Rivers' son Jason had a
history of violence and mental instability.  Jason had a key to
the house and was permitted full access to the property.  The
guns were locked in a cabinet in the basement, but the fastener
on the lock could be unscrewed.  Due to a missed probation
violation hearing, a warrant issued for Jason's arrest.  One
night, the police stopped Jason while he was walking alone on a
dark country road.  They found a hunting knife on his person and
ran a warrant check.  Before the warrant check was complete,
Jason fled.  In the ensuing chase, Jason shot and killed a police
officer with a gun he had taken from Kask's basement without her

knowledge or permission.  Kask was found to be negligent.  The
harm to the police officer was the type of potential risk that
made her behavior negligent in the first instance.  It did not
matter, for instance, that the officer was a total stranger, that
the precise victim could not have been foreseen, or even that the
extended sequence of events could not have been foreseen.  All
that mattered was that (1) Kask negligently gave Jason access to
the premises without ensuring additional security for the guns;
and (2) Jason committed a violent crime with one of the guns that
was negligently stored.  "Whether the owner actually did or
should have foreseen the particular [victim] and the particular
circumstances of the harm that eventually occurred was
irrelevant."  <u>Coombes</u> v. <u>Florio</u>, 450 Mass. 182, 189 (2007)
(citing <u>Jupin</u>, 447 Mass. at 149 n.8).

Given the Commonwealth's definition of foreseeability, it is
easy to conclude that Davis and Hussey's deaths were the type of
potential risks — violent crimes by Bulger and Flemmi — that made
the FBI's conduct negligent in the first instance.  At several
critical junctures — when Rico tipped off Flemmi about the
Fitzgerald indictment; when Connolly and Morris had Bulger and
Flemmi removed from the indictment in the race-fix prosecution;
when Connolly tipped off Bulger about Litif's desire to provide
incriminating information about Bulger to authorities; and when
Connolly tipped off Bulger about the wiretap in the Lancaster
Street garage — the actions of the FBI created an unreasonable
risk of physical harm to others, enabling Bulger and Flemmi to
avoid arrest and continue to murder.  That Davis and Hussey were

the unfortunate victims, victims who could not have been particularly foreseen, does not matter under Massachusetts law. Had the FBI not taken these actions, various law enforcement agencies would have investigated and prosecuted Bulger and Flemmi.  The various investigations and prosecutions were unsuccessful only because the FBI intervened to ensure that Bulger and Flemmi stayed out on the street.  Doing so was negligent, and caused foreseeable injury to the victims of their violence, Davis and Hussey.[14]

## C.    Scope of Employment

The FTCA requires that the government employee's conduct fall within the scope of his or her employment as determined by state law.  28 U.S.C. § 1346(b)(1); Aversa v. United States, 99 F.3d 1200, 1209 (1st Cir. 1996).  Massachusetts uses a three-pronged test to determine the scope of employment.  The conduct must be: (1) of the kind the employee was hired to perform, (2) occur within authorized time and space limits, and (3) motivated, at least in part, by an intent to serve the employer.  Pinshaw v. Metro. Dist. Comm'n, 402 Mass. 687, 694 (Mass. 1988).

The scope of employment analysis in this case is greatly simplified because the First Circuit has already held, on more or less identical facts as those at issue here, that Connolly's conduct was within the scope of his employment.  McIntyre v. United States, 545 F.3d 27, 38-47 (1st Cir. 2008).  As to the

---

[14] Because the FBI is liable under a theory of general negligence, the Court will not address the Plaintiffs' alternative negligence theories regarding liability such as providing substantial assistance to Bulger and Flemmi or failing to control Bulger and Flemmi despite having a special relationship with them.

first prong of the test, the First Circuit held that the disclosure of an informant's identity under circumstances where Connolly should have known that Bulger and Flemmi would murder the informant was a part of Connolly's employment that was not only tolerated, but rewarded, by his superiors.  Regarding the third prong, the First Circuit held that the bribes that Connolly took did not change the fact that Connolly was motivated, at least in part, by a desire to serve his employer.

The record in this case establishes that the protection Bulger and Flemmi received from their FBI handlers was acquiesced in, and rewarded by, their superiors.  Both Rico and Connolly received various financial and other incentives for their work with informants.  Even after years of thwarted investigations, Connolly's supervisors failed to rein him in.  In fact they did the opposite, drafting memos to justify keeping Bulger and Flemmi as informants.  Thus, both the leak of Litif's desire to cooperate and the various actions taken to keep Bulger and Flemmi out of prison were within the scope of Rico's and Connolly's employment.

### D.  Intentional Infliction of Emotional Distress

The Litif and Hussey families make claims for intentional infliction of emotional distress.  The elements of this tort in Massachusetts are that (1) the actor intended to inflict emotional distress or he knew or should have known that emotional distress was the likely result of his conduct; (2) the conduct was "extreme and outrageous," was "beyond all possible bounds of decency," and was "utterly intolerable in a civilized community;"

(3) the actions of the defendant were the cause of the
plaintiff's distress; and (4) the emotional distress sustained by
the plaintiff was "severe" and of a nature "that no reasonable
man could be expected to endure it."  Agis v. Howard Johnson Co.,
371 Mass. 140, 144-45 (Mass. 1976) (internal citations omitted).
Traditionally, bystander plaintiffs, i.e., family members
distressed by harm inflicted on a relative, could only recover if
they were present during the commission of the injury.  The
Supreme Judicial Court, however, relaxed the strict physical
presence requirement, instead requiring "substantially
contemporaneous knowledge of the outrageous conduct."  Nancy P.
v. D'Amato, 401 Mass. 516, 522 (Mass. 1988).

In Limone v. United States, 497 F. Supp. 2d 143 (D. Mass.
2007), Judge Gertner offered two alternative theories for
intentional distress liability in the context of the FBI's cover-
up of a wrongful conviction.  Judge Gertner held that the
victim's family had contemporaneous knowledge of the wrongful
conviction.  Judge Gertner also held that a cover-up suspended
the contemporaneous knowledge requirement so that a tortfeasor
might not profit by concealing his wrongdoing.  Limone, 497 F.
Supp. 2d at 228-29.

The Litif and Hussey families' claims, however, are
different in important respects from the claim in Limone.
Hussey's family did not have knowledge of her murder until
decades later.  They cannot be said to meet the substantially
contemporaneous knowledge requirement.  Heinrich ex rel. Heinrich
v. Sweet, 49 F. Supp. 2d 27, 40 (D. Mass. 1999) (denying recovery

where family learned of harm decades later).  As to Litif:
First, his family's discovery of his murder was not
"substantially contemporaneous."  Second, the later discovery of
the "outrageous conduct" in terms of government involvement did
not cause severe emotional distress.  And third, the grisly
manner in which the family discovered Litif's body was not
foreseeable by Connolly.

Massachusetts courts have not construed the "substantially
contemporaneous knowledge" as broadly as Litif suggests.  The
courts of the Commonwealth have ruled against liability in cases
where the injury was discovered only four or seven hours after
the fact.  See Krasnecky v. Meffen, 56 Mass. App. Ct. 418, 422
(2002) (collecting cases).  Litif's body was discovered nearly a
full day after he was murdered.  Thus, his family did not have
the requisite contemporaneous knowledge of the injury.  Nor can
some kind of equitable tolling help the family in this case.
Although Connolly's "outrageous conduct" was only discovered
years after the fact, there is no evidence that the discovery of
Connolly's involvement caused any emotional distress.  Any
emotional distress the Litif family experienced occurred in the
period immediately following the murder.  Finally, if the
"outrageous conduct" is the placement of Litif's body in the
trunk, where Luanne Litif may have seen it, there is no evidence
that Connolly should have known that the body would be discovered
in this way.  If anything, the proper inference is that Litif's
body would be hidden, like the Bulger Gang's other murder

victims.  The Litif family's claim for intentional infliction of emotional distress is denied.

### E.    Affirmative Defenses

#### 1.    Statute of Limitations

The statute of limitations in this and the other FTCA cases involving the same misconduct has been much contested.[15]  Once again, the First Circuit has dealt with this issue in nearly identical factual contexts, although the Davis and Hussey cases present some new wrinkles.  Judge Lindsay has also addressed this issue in this very case at the motion to dismiss stage.  Estate of Davis ex rel. Davis v. United States, 340 F. Supp. 2d 79, 83-84 (D. Mass. 2004).

The general framework is well-known.  Plaintiffs must present an administrative claim to the relevant agency within two years of the date the claim accrued.  28 U.S.C. § 2401(b).  Claims that do not meet this requirement must be dismissed.  Skwira v. United States, 344 F.3d 64, 71 (1st Cir. 2003).  The "'discovery rule' . . . governs claim accrual under the FTCA under circumstances where the fact or cause of an injury is unknown to (and perhaps unknowable by) a plaintiff for some time after the injury occurs."  Rakes v. United States, 442 F.3d 7, 19 (1st Cir. 2006).

Under the discovery rule, claims will accrue only "when the injured party knew or, in the exercise of reasonable diligence,

---

[15] The claims in McIntyre, Castucci, Halloran/Donahue, and Limone were timely.  Several claimants were untimely.  See Rakes v. United States, 442 F.3d 7, 23-24 (1st Cir. 2006); Barrett v. United States, 462 F.3d 28, 39-41 (1st Cir. 2006); Callahan v. United States, 426 F.3d 444, 455 (1st Cir. 2005); Wheeler v. United States, 367 F.3d 38, 61 (1st Cir. 2004).

should have known the factual basis for the cause of action."
Id. (internal citations ommitted).  That is, the claims do not
accrue until "a person in the plaintiff's position . . . would
believe that he had been injured and would 'know sufficient facts
to permit a reasonable person to believe that there is a causal
connection between the government and the injury.'"  Id. at 20
(quoting Skwira, 344 F.3d at 78).

    In determining what the plaintiff "should have known" the
court "start[s] the analysis by asking what generally available
information about the relevant facts the plaintiffs should be
charged with knowing."  Id.  It "then ask[s] whether a plaintiff
who knew at least that much would have made a further
investigation, and what such an investigation would likely have
revealed."  Id.  Finally, the court "asks whether the plaintiff,
if armed with the results of his or her investigation, would know
enough to permit a reasonable person to believe that she had been
injured and that there is a causal connection between the
government and her injury."  Bennett ex rel. Estate of Bennett v.
United States, 429 F. Supp. 2d 270, 277 (D. Mass. 2006) (Lindsay,
J.) (internal citation omitted).

    The "knowledge" component of the test "is far from
definitive" instead suggesting "a host of epistemological
possibilities."  Id. (internal citation omitted).  The First
Circuit variously has formulated the standard as: "sufficient
facts to permit a reasonable person to believe that there is a
causal connection between the government and her injury;"
"aware[ness] of [an] injury and its probable cause;" "notice of

the injury and its potential cause;" "hav[ing] reason to believe
that the government was responsible for the injury;" and
"hav[ing] some indication that there may have been a government
cause of the injury." Id. (quoting Skwira, 344 F.3d at 78).
When the plaintiff in a FTCA action is an estate, the knowledge
of any beneficiary with full authority to file a FTCA claim is
imputed to the estate.  Bennett, 429 F. Supp. 2d at 277.

a.   Timeliness for the Litif Family

Litif's claim was filed on September 10, 2001.  Thus, the
cut-off date for accrual is September 10, 1999.  The analysis for
Litif is nearly identical to the First Circuit's analysis in
McIntyre v. United States, 367 F.3d 38 (1st Cir. 2004).  To have
actual or constructive knowledge of their claim, the Litif family
would need to know that: (1)  Litif was an informant; (2) Bulger
and Flemmi killed Litif; (3) they did so because he was
threatening to incriminate them; (4) and they knew of his desire
to incriminate them through Connolly.  Assuming that the media
reports obligated the Litif family to make an inquiry, before
September 10, 1999, their inquiry would have run into several
dead ends: (1) no way to pin Litif's murder on Bulger (since
Weeks and Flemmi were not yet cooperating); (2) no way to show
that Bulger knew that Litif was an informant (for the same
reason); (3) official denials from the FBI as well as unofficial
denials from Connolly and Walsh in the press; and (4) no mention

in the <u>Salemme</u> proceedings[16] that Litif had been murdered because
he was an informant.   Further, as in <u>McIntyre</u>:

> Most avenues of investigation were cut off by the
> possibility of criminal liability for any FBI agents
> and others involved. Attempts to gain information
> through depositions would likely have been thwarted by
> invocations of the Fifth Amendment privilege against
> self-incrimination. And other information - such as
> testimony before the grand jury or facts discovered in
> the government investigation - was hidden behind a veil
> of secrecy.

<u>McIntyre</u>, 367 F.3d at 54-55.

Perhaps the most compelling way to frame the paucity of
evidence an investigation would have turned up is to note that no
one was ever indicted for Litif's murder, even after Flemmi and
Weeks fingered Bulger.[17]   In other words, all the Litif family
would have had after an investigation was "a mere . . . suspicion
. . . of a claim."   <u>Id.</u> at 52.

> b.   Timeliness for the Davis & Hussey Families

The cut-off date for the Davis family's claim is September
17, 1999.   The cut-off date for the Hussey family's claim is
January 11, 2000.   To have knowledge of the factual bases of
their claims, these Plaintiffs must have known that: (1) the
missing person was dead; (2) the missing person was murdered; (3)
Bulger and Flemmi were the murderers; and (4) the FBI's

---

[16] The only time Litif appears to have been mentioned in the
<u>Salemme</u> proceedings is when Flemmi was asked about Litif's murder
and invoked the Fifth Amendment.   <u>See</u> Ralph Ranalli, <u>Flemmi's
'Immunity' Challenged - Quizzed on Stand about Alleged Hit List</u>,
Boston Herald, Aug. 27, 1998, <u>available at</u> 1998 WLNR 275699.

[17] Indeed, the government continues to argue, in its post-
trial submissions, that even now there is insufficient evidence
for the Court to find that Bulger murdered Litif due to a leak
from Connolly.   Gov.'s Reply to Pls. Litifs' Post-Trial Brief at
2-3 (August 31, 2009) [Doc. No. 255].

protection of Bulger and Flemmi was a substantial cause of the murders.

In Wheeler v. United States, 367 F.3d 38 (1st Cir. 2004) (consolidated with McIntyre), and again in Rakes v. United States, 442 F.3d 7 (1st Cir. 2006), the First Circuit addressed FTCA claims that centered on the FBI's decades-long protection of Bulger and Flemmi, as opposed to one discrete act (such as the leak of an informant's identity).  The court held that news reports of relevant testimony in various proceedings and statements that family members made to the media tipped the scales against the plaintiffs.  Their claims accrued before the May 1999 cut-off date.

Like the Rakes and Wheeler plaintiffs, the Davis and Hussey families rely on the FBI's general protection of Bulger and Flemmi.  Further, both the Davis and Hussey families' claims were filed after Salemme was decided and after the claims of the plaintiffs in Rakes and Wheeler.  Nonetheless, the claims are timely.  Neither family knew, should have known, or could have known about the murders of their decedents until it became public that Kevin Weeks was cooperating with authorities in January 2000.  By contrast, the plaintiffs in Rakes and Wheeler had firsthand knowledge of their injuries.

An investigation by the Davis family before Weeks' cooperation would not have revealed that Davis was murdered or that Bulger and Flemmi were responsible.  Flemmi denied it. Davis might have had personal reasons to run away.  She had been removed from the missing persons database.  Thus, even with the

reasonable suspicions and the exposure of the FBI's protection of
Flemmi and Bulger, the Davis family had no sufficient knowledge
of the factual bases of their claim.   The same is true for the
Hussey family.   Hussey's sad life involved long absences.   Flemmi
denied any wrongdoing.   The strange reports of a daughter living
in California kept Marion Hussey's hope alive.

The plaintiffs in <u>Rakes</u> and <u>Wheeler</u> had much more concrete
information at their disposal.   There was no question that Roger
Wheeler was dead and that he was murdered.   Further, John Morris'
testimony during the <u>Salemme</u> proceedings, reported in the media,
explicitly mentioned Wheeler's murder, noting that Halloran told
Morris that Halloran was offered the "job" of murdering Wheeler.
<u>Wheeler</u>, 367 F.3d at 41, 50, 59.   The plaintiffs in <u>Rakes</u> also
had definitive information.   The Rakeses obviously knew of their
own extortion.   Moreover, Stephen Rakes was prosecuted for
perjuring himself due to threats from Bulger.   At his trial,
Julie Rakes Dammers testified that an IRS agent admitted to her
that Bulger was being protected by the FBI.   A police officer
testified that he spoke to Connolly about the extortion and
speculated that Connolly passed this information to Bulger.
<u>Rakes</u>, 442 F.3d at 23.   Had they inquired, both the <u>Wheeler</u> and
<u>Rakes</u> plaintiffs would have discovered sworn testimony supporting
the factual bases of their claims.   No such information was
available to the Davis and Hussey families.   Because they could
not have discovered the factual bases of their claims before the
applicable cut-off date, the claims of the Davis and Hussey
families are timely.

39

2.   Discretionary Function Exception

Like Sisyphus rolling his rock uphill, the government again
asserts that the discretionary function exception to the FTCA
applies, despite having failed to convince the courts in McIntyre
and Limone during motion practice, at trial, and on appeal, that
this argument had merit.  Section 2680(a) of Title 28 of the
United States Code revokes the FTCA's waiver of sovereign
immunity where a claim is "based upon the exercise or performance
or the failure to exercise or perform a discretionary function or
duty."  This provision does not apply, however, where the
government's conduct was "unconstitutional, proscribed by
statute, or exceeded the scope of the agent's authority."  Davis,
340 F. Supp. 2d at 93 (quoting Thames Shipyard & Repair Co. v.
United States, 350 F.3d 247, 254 (1st Cir. 2003)).  Judge Gertner
has made the point forcefully: The FBI's conduct "cannot remotely
fit within the discretionary function exception without doing
violence to everything for which our country stands. . . . No
government actor has 'discretion' to violate the Constitution,
statutes, regulations or rules that bind them."  Limone v. United
States, 497 F. Supp. 2d 143, 203 (D. Mass. 2007) (citing Muniz-
Rivera v. United States, 326 F.3d 8, 15 (1st Cir. 2003)).

The same result obtains here.  The FBI's conduct could
accurately be characterized as obstruction of justice (e.g.,
leaking the wiretap), racketeering (e.g., leaking that Castucci
was providing information), and in violation of agency guidelines
(e.g., leaking that Litif was an informant).  The FBI does not

have discretion to commit these acts, and the discretionary function exception to the FTCA does not apply.

### 3.   Comparative Negligence

In its Answer, the government asserted comparative negligence as a defense.  Gov.'s Mem. Supp. Mot. Leave to File Am. Answer at 3-4 [03-10087-WGY Doc. No. 56].  During closing arguments, it admitted this defense was "weak."  Trial Tr. vol. 11, 40:13-18.  It never cited any legal authority in support of this defense and failed to articulate any duty the Plaintiffs violated.  There is no legal duty to report a crime in Massachusetts.  See Commonwealth v. Senior, 454 Mass. 12, 17 (2009).  The government simply dreamt up a duty of self-preservation that the Plaintiffs allegedly breached by fraternizing with known criminals.  There is no support for such a proposition.  Thus, none of the damages will be offset for comparative negligence.

## IV.  MIXED FINDINGS & RULINGS ON DAMAGES

Because each of the Plaintiffs has satisfied all the elements of a successful FTCA claim, and the government's affirmative defenses have failed, liability attaches and damages, if any, must be awarded.  The government is not liable for punitive damages or interest prior to judgment.  28 U.S.C. § 2674.  Under the Massachusetts Wrongful Death Statute, Mass. Gen. Laws ch. 229, §§ 1-2, 6 (the "Statute"), the government is liable for the loss of reasonably expected net income, loss of consortium, reasonable funeral and burial expenses, and the conscious suffering of each decedent.

**A.  Loss of Consortium**

   1.  The Litif Family

Loss of consortium damages are "notoriously difficult to quantify." Havinga v. Crowley Towing & Transp. Co., 24 F.3d 1480, 1484 (1st Cir. 1994).  "[T]here is no scientific formula or measuring device that can be applied to place an exact dollar value on noneconomic damages . . . ." Muñiz v. Rovira, 373 F.3d 1, 8 (1st Cir. 2004).  Still, the Court must use "a process of rational appraisal" based upon "the evidence adduced at trial." Ruiz v. Gonzalez Caraballo, 929 F.2d 31, 35 (1st Cir. 1991).

The evidence established that Litif had an extremely close relationship with his daughter, Luanne.  Litif provided for her material needs and also offered much counsel and advice.  He coached her baseball teams, and the two met for weekly exercise.  Although Luanne had reached majority, she was still quite young when her father was killed.  Luanne Litif is awarded $500,000.

Lee Litif was not as close with his father due to certain unspecified social disabilities.  Nonetheless, Lee and his father did attend sporting events and concerts.  The loss of his father's companionship, counsel, and advice, despite the relative lack of affinity, was significant.  Lee Litif is awarded $250,000.

Litif's relationship with his wife Anna was also complicated.  Although the two would discuss issues pertaining to the children, the evidence shows that Litif did not live at home and had taken up with another woman.  Accordingly, Anna is awarded $50,000.

2.   The Davis Family

Debra Davis' sole heir, and the administratrix of her estate, was her mother Olga.  Olga Davis died in 2007.  Thus, one question presented is whether Olga's claim for loss of consortium survives her death.  A second question is whether Olga, as the parent of an independent adult child who had left the home, is entitled to loss of consortium damages.

Massachusetts does not recognize a separate tort for loss of consortium in wrongful death cases.  The only way to collect damages for loss of consortium is through the Statute.  And only the administrator of the estate can bring an action seeking loss of consortium.  Hallet v. Town of Wrentham, 398 Mass. 550, 555-56 (1986).  Therefore, it is fair to say that because the remedy belongs to the estate, it is not affected by the death of one of the estate's beneficiaries.  Further, under Massachusetts General Law chapter 228 section 1, actions for damages "to the person" survive the death of the plaintiff.  Damages to the person need not be physical.  Harrison v. Loyal Protective Life Ins. Co., 379 Mass. 212, 214-19 (1979) (holding that the infliction of emotional distress is damage to the person).  Consequently, it is proper to conclude that Olga Davis' claim for loss of consortium survives her death.  To the same effect, see Judge Gertner's award of $1,000,000 to the estate of Jeannette Tameleo although she had passed away during her husband's wrongful incarceration even before his civil action had been filed.  Limone, 497 F. Supp. 2d at 248, aff'd, 579 F.3d 79 (1st Cir. 2009).

Under the Statute, when there is no surviving spouse, damages for loss of consortium go to the next of kin.  Mass. Gen. Laws ch. 229, § 1.  Section 2 of the Statute defines loss of consortium as loss of the "services, protection, care, assistance, society, companionship, comfort, guidance, counsel, and advice of the decedent."  Mass. Gen. Laws ch. 229, § 2. Based on this statutory framework, the Supreme Judicial Court has held that an adult emancipated child who was not dependent on his parents, and whose parents were not dependent on him, could nevertheless recover for loss of consortium.  Schultz v. Grogean, 460 Mass. 364, 367-78 (1990).  Olga Davis is therefore eligible to recover consortium damages.

Debra Davis was an adult, did not live at home, and did not provide financial support or services to her mother.  Grief and emotional loss is not loss of consortium.  Nevertheless, the evidence at trial sufficiently establishes that Olga Davis suffered precisely the losses the Statute was enacted to compensate.  There was testimony that Debra and Olga spoke frequently (daily by phone), visited frequently, vacationed together, and that Debra asked after Olga's health, reminded her about her medications, and occasionally took her shopping.  From time to time, the two women did each other's hair in a companionable fashion.[18]  Olga Davis Dep. 54:17-19; 55:4-7; 86:3-

---

[18] I am acutely aware that in rendering the tentative findings and rulings on July 24, 2009, I reached a contrary ruling on this very issue.  The facts have not changed.  The practice of fact-finding from the bench at the close of a civil jury waived case is a salutary one, for it is then that the evidence is freshest in the judge's mind and credibility determinations best made.

The discipline of writing, reflected in the general mandate

14; 88:2; 95:17-20.  See McIntyre, 447 F. Supp. 2d at 116-17

(awarding consortium damages to plaintiff's mother).  The

evidence shows that the Davis family was a close, caring family.

What then ought be the measure of these damages?  Olga Davis

lived for twenty-seven years after the murder of her daughter

Debra.  This Court notes that an experienced and distinguished

Justice of the Superior Court has awarded the Davis estate

$5,000,000 for precisely this same loss of consortium.  Davis v.

Flemmi, No. 01-282, Findings on Assessment of Damages, at 2

(Mass. Sup. Ct. Sept. 16, 2009).  While the government is not a

party to this state case and is in no way bound by the

determinations made therein, this finding, coming as it does from

a justice of the Commonwealth's "great trial court,"[19]  which

daily handles these cases (which rarely come into federal court),

is closer to the jury verdicts of the people of the Commonwealth,

and which contemporaneously measures exactly the same loss to the

_____

of Fed. R. Civ. P. 52(b), is likewise salutary for it forces
reflection.  I served as a justice of the Massachusetts Superior
Court from 1978-1985.  During that service I tried a number of
wrongful death actions and I erroneously drew the legal
conclusion that I would have drawn back then.  The Massachusetts
Superior Court is "likely [] the finest common law trial court in
America today," Peter M. Lauriat, Jury Trial Innovation and
Improvement, in Massachusetts Superior Court, 150 Years of the
Rule of Law 1859-2009, Reflections of the Justices 53, 54 (Judith
Fabricant ed., 2009) and it is the essential genius of a common
law court that its understanding evolves to meet the mores and
needs of the people of the Commonwealth.  By harking back to my
own service in the early 1980's, I gave insufficient deference to
the explication of the law provided by the Massachusetts Supreme
Court in Schultz v. Grogean, 460 Mass. 364 (1990).  This opinion
gives me the opportunity to correct that error.

[19] See Irwin v. Comm'r of the Dep't of Youth Services, 388
Mass. 810, 815 (1983) (Lynch, J.); Pinnick v. Cleary, 360 Mass 1,
41 n.3 (1971) (Tauro, C.J., concurring); MacArthur Bros. v.
Commonwealth, 197 Mass. 137, 139 (1908) (Rugg, C.J.).  See also
Pierce v. Dew, 626 F. Supp. 386, 387 (D. Mass. 1986); Roy v.
Bolens Corp., 629 F. Supp. 1070, 1072 (D. Mass. 1986).

identical victim under the same Massachusetts statute for a wrongful death for which the government should share joint and several liability, is entitled to a significant degree of deference on persuasive grounds if nothing else.

It is no answer to say that the state case was an assessment of damages on a paper record against a life felon who is judgment proof.  The burden of proof and the obligation of accurate fact finding is the same there as here.  Nor does it make any difference that here it is the federal government that is liable and the taxpayers must bear the judgment.  <u>See</u> 28 U.S.C. § 1346(b)(1); Mass. Gen. Laws ch. 229, § 2.

What gives this Court pause is that the finding in <u>Davis</u> v. <u>Flemmi</u> appears out of line with the findings made in this federal district court for similar losses for similarly situated victims. Consider:

**Loss of Consortium Damages Awarded in Related Cases:**

<u>Castucci</u> v. <u>United States</u>, No. 02-11312-WGY (D. Mass. June 11, 2009)
| | |
|---|---|
| Wife: Sandra Castucci | $3,000,000 |
| Children: | |
|     Richard Castucci, Jr. | $500,000 |
|     Denise Castucci | $500,000 |
|     Brian Castucci | $750,000 |
|     Lisa Castucci Inello | $750,000 |

<u>Litif</u> v. <u>United States</u>
| | |
|---|---|
| Wife: Anne Litif | $ 50,000 |
| Children: | |
|     Luanne Litif | $500,000 |
|     Lee Litif | $250,000 |

<u>McIntyre</u> v. <u>United States</u>, 447 F. Supp. 2d 84, 117 (D. Mass. 2006) (Lindsay, J.), <u>aff'd</u>, 545 F.3d 27 (1st Cir. 2008).
| | |
|---|---|
| Mother: Emily McIntyre | $100,000 |

<u>Halloran</u> v. <u>United States</u>, No. 01-11346-WGY (D. Mass. May 6, 2009)

```
        Wife: Patricia Macarelli                    $200,000
```

Donahue v. United States, No. 01-10433-WGY (D. Mass. May 7, 2009)
```
        Wife: Patricia Donahue                      $3,000,000
        Children:
                Michael Donahue                     $750,000
                Shawn Donahue                       $750,000
                Thomas Donahue                      $750,000
```

Limone v. United States, 497 F. Supp. 2d 143, 247-249 (D. Mass. 2007) (Gertner, J.), aff'd, 579 F.3d 79 (1st Cir. 2009).

```
Peter Limone
        Wife: Olympia Limone                        $1,000,000
        Children:
                Peter Limone, Jr.                   $200,000
                Paul Limone                         $200,000
                Carolyn Limone Zenga                $200,000
                Janine Limone Arria                 $200,000

Enrico Tameleo
        Wife: Estate of Jeannette Tameleo           $1,000,000
        Child: Saverio Temelo                       None (adult,
                                                    emancipated child)
Louis Greco
        Ex-wife: Roberta Werner                     None (divorced,
                                                    tenuous
                                                    relationship)

        Children:
                Edward Greco                        $200,000
                Estate of Louis Greco, Jr.          $200,000

Joseph Salvati
        Wife: Marie Salvati                         $1,000,000
        Children:
                Maria Sidman                        $200,000
                Gail Orenberg                       $200,000
                Sharon Salvati                      $200,000
                Anthony Salvati                     $200,000
```

This Court has analyzed these awards from every conceivable angle but finds no discernable controlling pattern once the Court finds a loving, committed relationship between spouses or between parent and child.  The Court notes that the Statute awards relief first to a spouse and thereafter to the next of kin.  Mass. Gen. Laws ch. 229, § 1.  Among the next of kin, children precede parents in intestate succession in Massachusetts.  See Mass. Gen. Laws ch. 190, §§ 1-3.  This ordering indicates the people's

representative, the Massachusetts legislature, perceive a rough hierarchy in the value of consortium.  An accurate, comprehensive study of recent Massachusetts jury awards[20] would be most persuasive on this issue, but no such study exists.  Then there is the cognate award on this very issue in Davis v. Flemmi.

In the end, though, it falls to this Court and no one else to do justice in this case.  All things considered, the Court awards the Estate of Debra Davis $1,000,000 for Olga Davis' loss of consortium.

### A.   Conscious Pain & Suffering

Here too, "converting feelings such as pain, suffering, and mental anguish into dollars is not an exact science."  Correa v. Hosp. San Francisco, 69 F.3d 1184, 1198 (1st Cir. 1995).  The fact-finder "is free . . . to harmonize the verdict at the highest or lowest points for which there is a sound evidentiary predicate," provided that the result does not "strike such a dissonant chord that justice would be denied were the judgment permitted to stand."  Milone v. Moceri Family, Inc., 847 F.2d 35, 37 (1st Cir. 1988).

Davis and Hussey were strangled to death.  Death by asphyxiation is not immediate, so at least a few minutes must have passed from the time that these victims realized they were being murdered until they lost consciousness.  The Davis family

---

[20] In Limone, Judge Gertner cited loss of consortium awards in other jurisdictions.  Limone, 497 F. Supp. 2d at 247, 248-49. My own view is that jury awards vary markedly from jurisdiction to jurisdiction.  What reliable information exists tends to suggest that Massachusetts juries are comparatively stingy.  See Thomas H. Cohen, Bureau of Justice Statistics, Tort Bench and Jury Trials in State Courts, 2005, at 21, Appendix table 5 (November 2009) available at http://bjs.ojp.usdoj.gov/content/pub/pdf/tbjtsc05.pdf.

has not carried its burden of proving that Debra's final moments were more extensive than that.  The evidence showed that Litif was stabbed multiple times before he was shot and rendered unconscious.  But here too, the Litif family did not carry its burden of proving that Litif's murder took more than a few minutes.  Consequently, each of the families is awarded $350,000 for conscious pain and suffering.

### B.   Funeral Expenses

The Court awards funeral expenses borne by the estates in accordance with the Statute.  The parties have agreed that the Estate of Davis incurred $2,005.60 and the Estate of Hussey incurred $4,795.00.  The Court awards these amounts.  The Litif family did not seek funeral expense damages.  Mem. Supp. United States' Mot. Clarify Sept. 30, 2009 Order, at 2 [Doc. No. 260].

### C.   Reasonably Expected Net Income

The Litif family also seeks Louis Litif's reasonably expected net income.  "It should be noted that the statute refers to net income and hence, the issue is future earnings and not future earning capacity."  Joseph R. Nolan & Laurie J. Sartorio, 37A Massachusetts Practice § 28.3 (3d ed. 2009).  For example, the estate of a stay-at-home mother who intended to go back to work when her children were older was not entitled to recover expected net income.  Santos v. Chrysler Corp., No. 921039, 1996 WL 1186818, at *2 (Mass. Super. Ct. Sept. 18, 1996).  In addition, income from illegal activities cannot form the basis of such an award.  Gibbs v. United Mine Workers of America, 343 F.2d 609, 618 (6th Cir. 1965), rev'd on other grounds, 383 U.S. 715 (1966).

The Litif family did not present sufficient evidence to establish that Litif had a steady income stream from a legitimate source.  The uneven social security records, Trial Ex. 22, and the lack of any pay stubs or other records renders any conjecture as to Litif's expected net income too speculative.  No family member ever visited Litif at the sporting goods store where he is alleged to have worked.  Nor is there sufficient evidence to prove that Litif actually owned a bar or received a paycheck for bartending.  The Litif family is not entitled to any damages for loss of expected net income.

**V.    ORDER FOR JUDGMENT**

Based on the foregoing, the United States is liable to the Plaintiffs as follows:

1.    To the Estate of Louis Litif, in the amount of $350,000 for conscious pain and suffering and $800,000 for loss of consortium, totaling $1,150,000.

2.    To the Estate of Debra Davis, in the amount of $350,000 for conscious pain and suffering, $1,000,000 for loss of consortium, and $2,005.60 for funeral expenses, for a total of $1,352,005.60.

3.    To the Estate of Deborah Hussey, in the amount of $350,000 for conscious pain and suffering and $4,795.00 for funeral expenses, less $135,000 received from the Commonwealth through its victim compensation program, totaling $219,795.  The defendant Flemmi is adjudicated jointly and severally liable to the Hussey Estate for this sum.

## VI.   A FINAL NOTE

Taken together, these related cases present a dark and cautionary tale.  Here the government - our government - stooped so low as simply to disregard its fundamental legal obligation of insuring "domestic tranquility" to *all* its citizens equally. Instead, having apparently written these folks off as assorted "low-lifes," it proceeded to frame innocents (e.g., Limone, Tameleo, Greco, Salvati) and knowingly expose other innocents to murder (e.g., Barrett, Donahue, Davis, Hussey).  Indeed, in its arrogant hubris the government - our government - undertook to decide which informants would live (Ciulla) and which were expendable (Castucci, Litif, McIntyre, Halloran).

Then, when its perfidy was revealed, the government - our government - sought to treat its failures as nothing more than a public relations issue.  First it obstructed at every turn, <u>see e.g.</u>, <u>Salemme</u>, 91 F. Supp. 2d at 301-15; when that failed, its position was "a few rogue agents," nothing more.  Ignoring the deep-seated institutional failures within the FBI, its rigid hierarchical internal reporting system,[21] the utter break-down of internal supervision, the bitter enmity its obstruction engendered within the Massachusetts State Police, and the marked continuing distrust its false affidavits have engendered in the judiciary, the government - our government - has never

---

[21] Even over a decade later, the Court sadly notes the same finding made by the 9/11 Commission.  <u>See</u> National Commission on Terrorist Attacks Upon the Untied States, <u>The 9/11 Commission Report</u> 73-80 (Official Government ed.)(criticizing FBI for lack of communication and information sharing both among FBI's individual field offices and with other law enforcement agencies).

disciplined any high-ranking supervisor or undertaken any
comprehensive transparent review or reform.

Nor is the failure limited to a single agency, however
important.  The arrogant hubris displayed by Rico, Connolly, and
Morris, appears to pervade the government – our government – at
all levels.  How else to explain the conduct of the litigation
here?  No one gainsays the government its right vigorously to
defend the taxpayers who must ultimately pay the judgment.  A
vigorous defense, however, cannot excuse the obstructionism in
the Salemme case, see, e.g., 91 F. Supp. 2d at 301-15, or the
litigation misconduct found in McIntyre, see Order Adopting
Report and Recommendations on Pl.'s Mot. Atty's Fees and Costs
(May 19, 2009) (adopting Magistrate Judge's findings as to
government's liability for litigation misconduct); Report and
Recommendations on Pl.'s Mot. Atty's Fees and Costs [01-10408-RCL
Doc No. 714].  Before me, the government conducted itself with
technical expertise, full obedience of the Court's direct orders
– and a striking lack of judgment.  Here, the government – our
government – seriously argued that the horrifying acts of its
agents against our own people fell within their legitimate
"discretion," and that the victims and their families were
somehow complicit in their own murders, well knowing no
Commonwealth court has ever suggested such a bizarre legal
theory.  Most repulsive, the government – our government –
virtually argued "she was asking for it," until the Court,
remembering that Massachusetts has emphatically rejected this
demeaning argument, see generally Commonwealth v. Cordeiro, 401
Mass. 843 (1988), warned the government to steer clear.

Most important, though, the government almost got away with
it.  In the end, as Wellington said of Waterloo, "it was a damned
close run thing,"[22] proof of the old adage that "all it takes for
evil to triumph is for good men to keep silent."[23]  In this case,
however, there was that good man.

In presiding over <u>United States</u> v. <u>Salemme</u>, Judge Mark L.
Wolf's tenacity, perceptivity,[24] and courage has shown the light
of true judicial independence on that which our government wished
to conceal from our people.  It is true of trial courts that
"most of the court's cases are long forgotten; indeed, few of its
cases were ever of any interest to anyone except the parties

---

[22] Although commonly quoted as such, Wellington's statement
is documented in a seemingly accurate historical source as, "[i]t
has been a damned nice thing - the nearest run thing you ever saw
in your life."  <u>The Creevey Papers, A Selection from the
Correspondence & Diaries of the Late Thomas Creevey</u> 236 (Sir
Herbert Maxwell ed., 1904).

[23] Commonly attributed to the Irish political philosopher,
Edmund Burke, his precise statement was, "When bad men combine,
the good must associate, else they will fall, one by one, an
unpitied sacrifice in a contemptible struggle."  Edmund Burke,
<u>Thoughts on the Cause of the Present Discontents</u> 106 (6th ed.
1734).

[24] I readily admit that when the allegations of serious FBI
misconduct first surfaced in the press, I considered them
preposterous.  There is a risk, of course, that as fact pleading
becomes more pervasive, <u>see</u> <u>generally</u> <u>Ashcroft</u> v. <u>Iqbal</u>, 129 S.
Ct. 1937 (2009); American College of Trial Lawyers Task Force on
Discovery & The Institute for the Advancement of the American
Legal System, <u>Final Report</u> 5-6 (March 2009), <u>available at</u>
http://www.actl.com/AM/Template.cfm?Section=Home&template=/CM/Con
tentDisplay.cfm&ContentID=4053, judges will fall back on their
own, fairly narrow life experiences and improperly evaluate facts
pled rather than simply matching the allegations to the legal
theories advanced.  <u>See</u> Harvard Law Review Association, <u>Pleading
Standards</u>, 123 Harv. L. Rev. 252 (2009) (criticizing <u>Iqbal</u> on
this ground); Stephen B. Burbank, <u>Pleading and the Dilemmas of
Modern American Procedure</u>, 93 Judicature 109 (2009); John Paul
Sullivan, <u>Twombly and Iqbal: The Latest Retreat From Notice
Pleading</u>, Suffolk U. L. Rev. (forthcoming 2010).  In my own
naivete, until Judge Wolf issued his <u>Salemme</u> opinion, I thought
George Higgins was writing fiction.  <u>See</u> George Higgins, <u>The
Friends of Eddie Coyle</u>.

concerned and their counsel . . . . History, it seems, is not generous to the memory of individual trial judges.  As individuals, they survive mainly in the bar's common recollection, which fades as the ranks of the bar change from generation to generation."[25]  There is, however, one thing that only a trial judge can do – preside over a fair, independent, and searching process for fact-finding.[26]  Done correctly, the result is a meticulous, utterly even-handed, and unassailable body of *facts*.

---

[25] Alan J. Dimond, <u>History of the Superior Court</u> as quoted by Francis R. Fecteau, <u>On the Shoulders of Giants</u>, <u>in Massachusetts Superior Court, 150 Years of the Rule of Law 1859-2009, Reflections of the Justices</u> 90 (Judith Fabricant ed., 2009)

[26]
> [F]act-finding is difficult.  Exacting and time consuming, it inevitably falls short of absolute certainty . . . .
>
> Judicial fact-finding is . . . rigorous.  Necessarily detailed, judicial fact-finding must draw logical inferences from the record, and, after lucidly presenting the subsidiary facts, must apply the legal framework in a transparent written or oral analysis that leads to a relevant conclusion.  Such fact-finding is among the most difficult of judicial tasks.  It is tedious and demanding, requiring the entirety of the judge's attention, all her powers of observation, organization, and recall, and every ounce of analytic common sense he possesses.  Moreover, fact-finding is the one judicial duty that may never be delegated to law clerks or court staff.  Indeed, unlike legal analysis, many  judges will not even discuss fact-finding with staff, lest the resulting conclusions morph into judgment by committee rather than the personal judgment of the duly constituted judicial officer.
> Fair and impartial fact-finding is supremely important to the judiciary . . . . [T]he true glory of our trial courts, state and federal, is their commitment to fair and neutral fact-finding.  Properly done, facts found through jury investigation or judicial analysis truly are "like flint."

William G. Young, <u>A Lament for What Was Once and Yet Can Be</u>, 32 B.C. Int'l & Comp. L. Rev. 305, 312-13 (2009) (noting the eclipse of fact-finding in today's federal district courts and arguing that it foreshadows the twilight of judicial independence) (internal citations omitted).

"There has to be a safe place," said Judge Richard S. Arnold.  "And we have to be it."[27]  There has to be some place in which "integrity," "truth," and "justice" have meaning regardless of preconceptions, power, or public opinion.  Judge Wolf's 664-page decision in United States v. Salemme, 91 F. Supp. 2d 141 (D. Mass. 1999) spoke truth to power and there was no going back.[28] All these related cases depend in large measure on Judge Wolf's seminal work.  For the people of Massachusetts, in all these related cases Judge Wolf is that "safe place."

This outcome was not inevitable.  Judicial independence is not immutable, even in America.[29]  These cases ought teach us – as perhaps nothing else can – the actual cost of losing the judicial independence so vividly on display in Salemme.  Here's the partial bill: a criminal FBI agent, corrupt to the core, living in honorable retirement on a public pension; a half dozen unsolved murders; literally dozens of people tortiously injured yet denied justice; two innocent men dying in prison under life sentences hopeless and helpless; others languishing in prison for

---

[27] "My generation knew no finer federal judge," said Justice Ruth Bader Ginsburg of Judge Arnold, a view echoed throughout the federal judiciary.  See Polly J. Price, Judge Richard S. Arnold 7 (2009).  The passage in the text was quoted by Justice David H. Souter in his valedictory address to the Third Circuit.  Shannon P. Duffy, Amid Some Tears, Souter Bids Adieu to 3rd Circuit, The Legal Intelligencer, May 6, 2009.

[28] Judge Lindsay's carefully detailed fact-finding in McIntyre v. United States, 447 F. Supp. 2d 54 (D. Mass. 2006) and Judge Gertner's in Limone v. United States, 497 F. Supp. 2d 143 (D. Mass. 2007) are likewise masterful exemplars of the judicial art of thorough, evenhanded fact-finding.

[29] Oddly, it is the institutional judiciary itself that may pose the greatest likelihood of diluting the quality of justice presently found in the District of Massachusetts.  See Judicial Conference of the United States, Preliminary Report: Judicial Conference Actions 5 (March 17, 2009).

years, three initially sentenced to death; two murdered young

women lying in unmarked and forgotten graves.

Think about that cost.

I do.


By the Court,


/s/ William G. Young
William G. Young
District Judge