UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| THE ESTATE OF DEBORAH HUSSEY, by<br>Marion Hussey, in her capacity as<br>Administratrix of the Estate of<br>Deborah Hussey, and<br>MARION HUSSEY,<br><br>          Plaintiffs,<br><br>v.<br><br>United States of America, et al.<br><br>          Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)  Civil Action No.:  03-10087 WGY<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## <u>MEMORANDUM SUPPORTING THE ESTATE OF DEBORAH HUSSEY'S MOTION for SANCTIONS against the UNITED STATES OF AMERICA</u>

Pursuant to Fed. R. Civ. P. 11 and 54 (d) (2) and 28 U.S.C. § 2412 (b), the Estate of Deborah Hussey moves for sanctions in the form of attorney fees against the United States of America.  Where to begin?  The bad faith of our government sadly started long before the murder of Deborah Hussey and continued right through the trial of her estate's claim under the Federal Torts Claim Act ("FTCA").  As chronicled in this case and the previous related cases, including <u>McIntyre v. United States of America, et al</u>. (C.A. 01-CV-10408); <u>Limone, et al. v. United States of America</u> (C.A. No. 02-CV-10890); and <u>Castucci v. United States of America, et al</u>. (C.A. No. 02-CV), the United States acted in bad faith from start to finish.[1]

The reasons for the Estate of Deborah Hussey's motion for sanctions for attorney fees are:  (1)  the government's denial of facts proven at trial for which it was forewarned

---

[1]  As the <u>Hussey</u> case was joined with the <u>McIntyre</u> and <u>Castucci</u> cases for discovery purposes the Court can consider the discovery violations presented before this Court in those two cases as well.

that sanctions would issue; (2) the government's position on discretionary function advanced in a motion to dismiss, a summary judgment motion and at trial; (3) the United States of America's assertion of the defense of comparative negligence; (4) the United States' failure to produce the DEA-6 debriefings of Stephen Flemmi during discovery and only doing so on the eve of trial; (5) the government's failure to produce Stephen Flemmi's list of bribes to law enforcement until ordered to do so in the middle of trial; and (6) the government's prelitigation bad faith conduct.

### A.   PLAINTIFF HUSSEY IS ENTITLED TO ATTORNEY FEES DUE TO THE BAD FAITH CONDUCT OF THE GOVERNMENT

The Equal Access to Justice Act ("EAJA"), 28 U.S.C. §2412 (b), provides:

> Unless expressly prohibited by statute, a court may award reasonable fees and expenses of attorneys . . . to the prevailing party in any civil action brought by or against the United States . . . The United States shall be liable for such fees and expenses to the same extent that any other party would be liable under the common law or under the terms of any statute that specifically provides for such an award.

The purpose of the EAJA, as discussed in the House Report, is to place opposing parties on an even playing field when litigating against the United States with its endless resources. Aronov v. Napolitano, 562 F. 3d 84, 88 (1st Cir. 2009) (The EAJA "reduces the disparity in resources between individuals . . . and the federal government," citing H.R. Rep. No. 99-120 (I) at 4.) See also In Re: Good Hope Industries, 886 F. 2d 480 (1st Cir. 1989). Section (b) of the EAJA permits an award of attorney fees when authorized by another statute or by common law. The plaintiff does not need to prove prejudice stemming from the bad faith action of the defendant.

The Estate of Hussey makes claims under both the common law exception that attorney fees are warranted because the government acted in bad faith, and because the

United States' attorneys violated a statute when signing pleadings lacking in a good faith because Fed. R. Civ. P. 11 has the "force of a federal statute." Sibbach v. Wilson & Co., 312 U.S. 1, 13 (1941).

As explained in Lucarelli v. United States, 943 F. Supp. 157, 158 (D.P.R. 1996):

> The common law standard applicable under § 2412(b) is a federal standard . . . The exception recognized by the federal courts to the "American Rule" that each party bear its own litigation costs includes . . . an exception for acting in bad faith, vexatiously, wantonly, or for oppressive reasons.  (Citations omitted.)

The United States Supreme Court has recognized the bad faith exception to the American Rule, even when other remedies are available.  In Chambers v. NASCO, 501 U.S. 32, 50 (1991), the Supreme Court held:

> There is, therefore, nothing in the other sanctioning mechanisms or prior cases interpreting them that warrants a conclusion that a federal court may not, as a matter of law, resort to its inherent power to impose attorney's fees as a sanction for bad-faith conduct.

The First Circuit has adopted the award of attorney fees for bad faith litigation conduct.  In Jones v. Winnepesaukee Realty, the Court ruled "[i]t is beyond dispute that a federal court possesses inherent power to shift attorneys' fees when parties conduct litigation in bad faith."  990 F.2d 1, 4 (1st Cir. 1993).  Another First Circuit decision noted attorney fees may be awarded when a party "acted in bad faith, vexatiously, or for oppressive reasons," and defined vexatious as meaning the party's actions were "frivolous, unreasonable or without foundation, even though not . . . in subjective bad faith."  (Citations omitted.)  Local 285, Service Employees International Union v. Nonotuck, 64 F.3d 735 (1st Cir. 1995).

In determining an award for attorney fees based on the government's bad faith the Court may "consider conduct both during and prior to the litigation, although the award

may not be based solely on the conduct that led to the substantive claim." McLarty v. United States, 6 F.3d 545, 549 (8th Cir. 1993) (citations omitted.)  In Rodriquez v. United States, 542 F.3d 704, 712 (9th Cir. 2008), the Court considered "'the totality of the circumstances' including conduct '*pre*litigation and during trial' when making [its] bad faith determination." (Emphasis in original) (Citations omitted.)

In addition to 24 U.S.C. § 2412 (b), the government violated Fed. R. Civ. P. 11 (b), when its attorneys signed pleadings relating to discretionary function and comparative negligence.[2]  The Court must issue sanctions when the pleadings are not "well grounded in fact [or] not warranted by existing law."  Adamson v. Bowen, 855 F. 2d 668, 672 (10th Cir. 1988).  The "standard by which courts evaluate the conduct of litigation is objective reasonableness—whether a reasonable attorney admitted to practice before the district court would file such a document."  Id. at 673.

## B.    FACTS PROVEN AT TRIAL THAT GOVERNMENT DENIED

At the final pretrial conference in the consolidated cases of Litif, Davis and Hussey on June 16, 2009, this Court issued a case management order requiring the government to review the decisions of the related FBI cases and mark with a "D" any fact the United States denies.  The Court admonished the government that sanctions would issue for facts it denies, but which the plaintiffs prove at trial.[3]  On June 29, 2009 the defendant filed the United States' Notice of Compliance with Court Orders Dated June 17, 2009 and June 22, 2009.  The Notice of Compliance was signed by Mary McElroy

---

[2]  Rule 11 provides that "[b]y presenting to the court a pleading, written motion—whether by signing, filing, submitting, or later advocating it—an attorney . . . certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:  (1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) the claims, defenses . . . are warranted by existing law or by a nonfrivolous argument for extending, modifying or reversing existing law or for establishing new law."

[3]  The United States sought reconsideration of the Order and on June 22, 2009, and the Court excluded the decision of the Honorable Mark L. Wolf in the Salemme case, but otherwise upheld the Order.

Leach, Assistant Director, Torts Branch, U.S. Department of Justice.  The Estate of

Hussey seeks sanctions for the facts the government denied, but which the plaintiffs

proved at trial.

**1.      Facts the Government Denied in McIntyre**

After eighteen days of trial in the McIntyre case, the Court (Lindsay, J.) issued its

Memorandum of Findings of Fact and Conclusions of Law on September 5, 2006.  Listed

below are the facts that United States **denied** in the McIntyre decision, and the Estate of

Deborah Hussey and other plaintiffs proved at trial:

1.      The United States, as a signatory to that Agreed Statement,[4] clearly found
the statements contained in the document to be credible.  Memorandum, p.
10, n. 9.

**Proven at trial**:  Under Fed. R. Evid. 801 (d)(2)(B), the Agreed Statement
in the criminal action of the United States v. Flemmi was admitted into
evidence as Exhibit 50 because as a signatory to the Agreed Statement
the government had manifested a belief in the truth of the document.
See also United States v. Kattar, 840 F.2d 118, 127 (1st Cir. 1988)
("The assertions made by the government in a formal prosecution . . .
'establish the position of the United States and not merely the views of its
agents who participate therein.'"  Id. at 131 (Citations omitted.))

2.      The files of the Boston Office, including Bulger and Flemmi's informant
files, are replete with references to their involvement in loansharking and
bookmaking between 1965 and 1987.  Memorandum, p. 35.

**Proven at trial**:  See Exhibit 83, 1997 Office of Professional
Responsibility Investigation, p.4 (MCN019-0008), "There were
84 references to Bulger and Flemmi's alleged criminal activities
in 157 separate reports provided by 49 independent sources during the
time period from 1970 to 1997.  See also Exhibits 102 (MCN064-2709-
2710) November 27, 1967 FBI "209" to Special Agent in Charge reads,
"Informant advised he talked to WINTERS and WINTERS stated
that FRANK SALAME and STEVIE FLEMMI are very aggressive and
will probably end up killing someone to show that they mean business in
connection with this move on bookmakers."

---

[4]      Agreed Statement of Facts in United States v. Flemmi, No. 99-10371 (D. Mass. Oct. 14, 2003),
which the McIntyre decision describes as "a document listing the facts to which the United States and
Flemmi agreed, prepared in contemplation of his guilty plea."  Memorandum, p. 10, n. 9.

3. Before the indictment [for the murder of Bennett and attempted murder of Fitzgerald] was issued, however, Rico warned Flemmi that he was about to be indicted, enabling Flemmi to go on the run for five years. Memorandum, p. 38.

**Proven at trial**: Testimony of Stephen Flemmi.

4. In December 1976, Connolly somehow discovered that Castucci had provided information to the FBI concerning the whereabouts of McDonald and Sims, and Connolly promptly disclosed what he had learned to Bulger. Memorandum, p. 40.

**Proven at trial**: Testimony of Stephen Flemmi. See also Exhibit 50, Agreed Statement of Facts, p. 7, "In December 1976, Bulger was informed by FBI agent John Connolly that Castucci was an informant for the FBI and that Castucci had disclosed the existence of the Greenwich Village apartment to the FBI. Bulger told defendant Flemmi, Winter, and Martorano about Castucci, and they decided to murder Castucci." See also Exhibit 40, September 30, 1976 FBI "209" to SAC Boston from Agent Thomas J. Daly (MCN0004-8362-8363), "Informant [Richard Castucci, BS 1236-CTE] advised that the people on the hill are taking care of both SIMS and MCDONALD at this time and the informant is attempting to get the exact location of the apartment from the source;" Exhibit 40 (MCN004-8364-8365) November 8, 1976 Daly "209" to Boston SAC, "informant [Castucci] advised as follows: SIMS and MCDONALD for the last four or five months have been staying in an apartment on the outskirts of Greenwich Village in Manhattan;" Exhibit 40 (MCN004- 8368-8369) December 30, 1976 Daly "209" to Boston SAC states, "informant [Castucci] advised . . . that FBI fugitives JOSEPH MCDONALD and JIMMY SIMS will be returning to the apartment at Christopher and Gay Sts., New York City, New York after the holidays."

5. Bulger, Flemmi, Winter, and Martorano then decided that Castucci had to be killed.

**Proven at trial**: Testimony of Stephen Flemmi. See also Exhibit 50, Agreed Statement of Facts, p.7, "In December 1976, Bulger was informed by FBI agent John Connolly that Castucci was an informant for the FBI and that Castucci had disclosed the existence of the Greenwich Village apartment to the FBI. Bulger told defendant Flemmi, Winter, and Martorano about Castucci, and they decided to murder Castucci."

6. What the Boston Office did not tell FBI Headquarters, however, was that

6

FBI agent Joseph L. Kelly had received information from one of his informants, within two weeks after the death of Castucci, that Bulger and Flemmi had killed Callahan.  Memorandum, pp. 40-41.

**Proven at trial**:  <u>See</u> Exhibit 40 (MCN004-8370), January 1977 teletype from Boston to Director of FBI that read:  "BUREAU IS ASSURED THAT SUBJECT'S DEMISE HAD NOTHING TO DO WITH HIS RELATIONSHIP WITH THE FBI IN BOSTON."  <u>Compare with</u> Exhibit 40 (MCN029-1611-1612) FBI "209" completed by Agent Joseph L. Kelly dated January 13, 1977 and based upon January 6, 1977 contact with an informant, which stated "Informant advised . . . that several people . .. believe that  RICHIE CASTUCCI was killed by members of the HOWARD WINTERS gang, specifically WHITEY BULGER and STEVIE FLEMMI."

7.    Castucci was the first of four informants killed by, or at the behest of, Bulger and Flemmi after the disclosure of his identity to them by Connolly.  Memorandum, p. 41.

**Proven at trial**:  Testimony of Stephen Flemmi.
<u>See also</u> Exhibit 50, Agreed Statement of Facts, p. 7,
"In December 1976, Bulger was informed by FBI agent John Connolly that Castucci was an informant for the FBI and that Castucci had disclosed the existence of the Greenwich Village apartment to the FBI.  Bulger told defendant Flemmi, Winter, and Martorano about Castucci, and they decided to murder Castucci."

8.    It may have been true that money was one of the factors contributing to Castucci's murder, but as Connolly well knew, there was also a connection between Castucci's murder and his status as an FBI informant.  Memorandum, p. 41, n. 44.

**Proven at trial**:  Testimony of Stephen Flemmi.  <u>See also</u> Exhibit 40 references cited in Number 6.

9.    O'Sullivan complied [with Connolly's and Morris' request to remove Bulger and Flemmi from the Race Fix indictment], and neither Bulger nor Flemmi was indicted, although both were listed as unindicted co-conspirators.  Memorandum, pp. 41-42.

**Proven at trial**:  Testimony of Stephen Flemmi.

10.    The legal difficulties [for Bulger and Flemmi] did not materialized *precisely because* Connolly and Morris went to O'Sullivan and emphasized Bulger's contributions to the Cosa Nostra investigation.

Memorandum, p. 42.

**Proven at trial**:  Testimony of Stephen Flemmi.

11.    Flemmi confirmed with Rico that Rico concurred in the decision to kill Wheeler.  Memorandum, p. 43, n. 45.

**Proven at trial**:  Testimony of Stephen Flemmi.

12.    Halloran was killed because he had provided information to the FBI implicating Bulger, Flemmi and Martorano in the Wheeler murder. Memorandum, p. 51.

**Proven at trial**:  Testimony of Stephen Flemmi.

13.    The files of the Boston [FBI] Office were replete with references to other criminal behavior by the pair [Bulger and Flemmi].  Memorandum, p. 62, n. 66.

**Proven at trial**:  See exhibit references cited in Number 2.  See also Exhibit 47, Stipulation Regarding James Bulger and Stephen Flemmi's Reported Criminal Activities, filed in the United States v. John Connolly (Criminal No. 99-10428-JLT).  Introductory statement reads:  "These summaries are not offered for their truth, but rather for information that was reported by agents of the F.B.I. regarding James Bulger and Stephen Flemmi," and is then followed by six pages of single spaced typing listing criminal activities of Bulger and Flemmi in the FBI's own files.  See also Exhibit 103, September 18, 1975 FBI "209" from Agent Thomas J. Daly to Boston SAC, which reads, "Informant stated that BULGER is by far the most vicious of all these individuals and is feared by many people because of his ability to kill anyone without even thinking twice."  (MCN047-0784)

14.    Instead, the FBI stuck its head in the sand when it came to the criminal activities of Bulger and Flemmi.  Memorandum, p. 64.

**Proven at trial**:  See exhibits cited in Numbers 2 and 13.

15.    In sum during the period 1975-1990, there were scores of reports in the files of the Boston [FBI] Office (including many based on self-reports by Bulger and Flemmi themselves) concerning criminal activity, none of which were deemed worthy of serious investigation by the Boston Office. Memorandum, p. 69.

**Proven at trial**:  See exhibits cited in Numbers 2 and 13.

16.  For decades preceding the McIntyre murder, agents of the FBI protected Bulger and Flemmi as informants by shielding them from prosecution for crimes they had committed.  Memorandum, p. 92.

**Proven at trial**:  Testimony of Stephen Flemmi.

## 2.  Facts the Government Denied in Castucci

On March 31, 2008 this Court (Lindsay, J.) issued an Order on Plaintiff's Motion

for Summary Judgment in the <u>Estate of Richard Castucci v. United States of America, et</u>

<u>al</u>.  The following facts were wrongly denied by the United States:

1.  Connolly (who is a defendant in this case), Bulger and Flemmi were co-conspirators in the murder of Castucci.  Order, p. 4.

**Proven at trial**:  <u>See</u> Exhibit 50, Agreed Statement of Facts, p 7, "In December 1976, Bulger was informed by FBI agent John Connolly that Castucci was an informant for the FBI and that Castucci had disclosed the existence of the Greenwich Village apartment to the FBI.  Bulger told defendant Flemmi, Winter, and Martorano about Castucci, and they decided to murder Castucci."

2.  In that testimony, Flemmi reported that Bulger told him and Martorano that Connolly had disclosed Castucci's informant status to Bulger.  Order, p. 5.

**Proven at trial**:  <u>See</u> citations in Number 1 above.

## 3.  Facts the Government Denied in Halloran

The Court (Lindsay, J.) heard oral argument on the Estate of Brian Halloran's

Motion for Summary Judgment on November 19, 2007.  The government denied the

following statement by Judge Lindsay:

The government's indictment of Connolly, that's the government's position that Connolly was responsible for Halloran's death; the agreed statement of facts in the Flemmi case in which the government and Flemmi agree that Halloran came in, gave the tip, and as a result of— gave the information to the FBI, and as a result of Halloran having cooperated with the FBI and Connolly having tipped Bulger and Flemmi that he was cooperating, Bulger killed Halloran.  Transcript, p. 46.

**Proven at trial**:  See Number 1 under <u>McIntyre</u> above at Section B 1.

**4.      Facts the Government Denied in Limone**

After several weeks of trial in the case relating to the wrongful conviction of four

men, including Limone and Salvati, for the murder to Teddy Deegan, the Honorable

Nancy Gertner wrote a 228 page opinion.  The United States improperly denied the

following facts from the Memorandum and Order Re: Bench Trial dated July 26, 2007:

1. The agents used the Flemmi brothers to manipulate Barboza into
   testifying in the Deegan murder case, passing the information to
   them for transmission to Barboza.  Memorandum, P. 16

   **Proven at trial**:  Testimony of Stephen Flemmi.

2. The corollary—apparently acceptable to the FBI—was that these
   informants might well continue to commit serious crimes.
   Memorandum, p. 23.

   **Proven at trial**:  Testimony of Stephen Flemmi.

3. Nor was Rico to ever disclose Stephen Flemmi's crimes to any
   state prosecutors.  Memorandum, p. 32.

   **Proven at trial**:  Testimony of Stephen Flemmi.

4. Stephen Flemmi was rewarded not only with money, but, according
   to Flemmi, agent Rico and others promised him that he would be
   protected from prosecution for his crimes.  Memorandum, p. 32.

   **Proven at trial**:  Testimony of Stephen Flemmi.

5. Flemmi did in fact escape prosecution for these charges [Bennett murder
   and Fitzgerald attempted murder] under circumstances that can only be
   explained by his extraordinary access to FBI agents, and in particular
   to Rico.  Memorandum, p. 33.

   **Proven at trial**:  Testimony of Stephen Flemmi.

6. As time went on, the FBI only became more and more embroiled with
   Flemmi and his crimes; with each passing year, the stench of the
   relationship intensified, heightening the FBI's interest in keeping

it from public view.  Memorandum, p. 101.

    **Proven at trial**:  Testimony of Stephen Flemmi.

7.    There is no reason to question [the facts agreed upon by both Flemmi and the United States'] credibility.  Memorandum, p. 101.

    **Proven at trial**:  <u>See</u> Number 1 under McIntyre above at Section 1.

8.    And, if the FBI's dealings with Stephen Flemmi had come to light, their efforts to protect him from prosecution after prosecution would have been extinguished.  Memorandum, p. 109.

    **Proven at trial**:  Testimony of Stephen Flemmi.

The Court warned it would issue sanctions if the United States denied facts in the related cases, which were subsequently proven in this trial.  The Litif, Davis and Hussey plaintiffs proved the numerous denials listed above and the Estate of Deborah Hussey seeks sanctions against the government in the form of attorney fees.

**C.**    <u>**THE GOVERNMENT'S POSITION ON DISCRETIONARY FUNCTION IN ITS MOTION TO DISMISS, MOTION FOR SUMMARY JUDGMENT AND AT TRIAL WAS FRIVOLOUS**</u>

The discretionary function exception precludes "[a]ny claim . . . based upon the exercise of or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion was abused."  28 U.S.C. § 2680 (a).

Despite its obligations under Fed. R. Civ. P. 11, the United States repeatedly argued that the discretionary function exception to the Federal Tort Claims Act applied to the claims of the Estate of Deborah Hussey.  The first time the government asserted the discretionary function exception was in a motion to dismiss.  The second time the defendant trotted out this exception was in a motion for summary judgment and the third time was during the trial of the case.

The Court (Lindsay, J.) rejected the government's position back in 2004 in its ruling on the motions to dismiss.  See Davis v. United States, 340 F. Supp. 2d 79 (2004).  Judge Lindsay explained in his ruling:

> More importantly, though, the government's method of attacking the legal sufficiency of the plaintiff's claims misses the mark.  The plaintiff's claims against the United States do not simply arise from an ineffective promise of immunity or a particular decision not to protect or warn an individual.  Instead, the plaintiff alleges that for decades, the FBI allowed—and in some instances even encouraged—Flemmi and Bulger to commit murder and other serious crimes.  Flemmi and Bulger were allegedly able to carry out these criminal activities because the FBI used deception and its political weight effectively to insulate the two alleged gangsters from prosecution by other federal and state law enforcement authorities.  According to the plaintiff, the FBI carried out its practice of protecting Flemmi and Bulger without any real regard to the foreseeable trail of victims, including Davis.

Id. at 85-86 (D. Mass. 2004).[5]

The government renewed its discretionary function argument in a motion for summary judgment filed on May 8, 2009.  The government argued that the discretionary function exception "bars plaintiffs' claims insofar as they are based on a failure to protect their decedents from being harmed by Flemmi or Bulger[.]"  Memorandum of Points, p. 12.  This position was nothing more than a rehashing of arguments previously rejected by the Honorable Reginald Lindsay and the Honorable Nancy Gertner.

Before the government filed its motion for summary judgment on May 8, 2009, it had the benefit of Judge Lindsay's ruling in this case in 2004, and significantly, Judge Gertner's decision in Limone v. United States, 497 F. Supp. 2d 143, 151 (D. Mass. 2007).

---

[5]  In his Davis decision, Judge Lindsay pointed to dicta in Pooler v. United States, 787 F. 2d 868 (3rd Cir. 1986), which noted:

> If the issue was the use of an undercover agent or informant whose known tendencies toward violence suggest a risk of physical harm either to the targets of an investigation **or to all bystanders**, the case might well be different.

Id. at 871.  (Emphasis added.)

In her Memorandum and Order on the Bench Trial she held that the discretionary function exception did not apply because the "government agents strayed outside of the bounds set on their discretion by statute, Constitution, and their own rules and regulations."  497 F. Supp. 2d 143, 167.  The words from Judge Gertner's Memorandum and Order in <u>Limone</u> prove that the government had notice before the filing its summary judgment motion in <u>Hussey</u> of the frivolous nature of the discretionary function defense:

> As my findings make clear, I do not find defendant liable under any claim based ***solely*** on the decisions to recruit Barboza and Flemmi, or ***solely*** on the failure to disclose exculpatory information.  My findings are based on the totality of the FBI's conduct, of which those claims are only a part.  That totality cannot remotely fit with the discretionary function exception without doing violence to everything for which our country stands.

<u>Id</u>.  (Emphasis in the original.)

As Judge Gertner explained, no government employee has "'discretion' to violate the Constitution, statutes, regulations or rules that bind them [and where FBI agents] took illegal actions . . . they acted outside their discretion."  <u>Id</u>.  The government cannot rely upon the discretionary function exception when its agents violated FBI and/or Department of Justice rules and regulations.  <u>Id</u>. at 168.

The <u>Limone</u> court cited some of the broken internal FBI regulations.  <u>Id</u>. at 168, n. 160.  For example, the FBI rules state:  "no employee shall engage in criminal, infamous, dishonest, immoral or notoriously disgraceful conduct or other conduct prejudicial to the Government."  The FBI's Manual of Instructions provides that "[w]hile it is proper for the FBI to use informants in appropriate investigations, it is imperative that special care be taken not only to minimize their use, but also to ensure that individual rights are not infringed and that the government itself does not become a violator of the law."  <u>Id</u>.

(Citations omitted).  To put it simply, the FBI's conduct was "illegal, unconstitutional and in violation of their own rules."  Id. at 169.  Such behavior does not merit the shield of the discretionary function exemption, and the government well knew it.

The Limone opinion was issued on July 26, 2007, almost two years before the United States filed its summary judgment motion in Hussey on May 8, 2009.  The acts and/or omissions of the FBI do not fall within the parameters of the discretionary function exception and as Judge Gertner so aptly commented, allowing the United States to invoke that exemption to the FTCA does "violence to everything for which our country stands."

The United States boldly, and at its own peril, ignored the well-reasoned decisions of Judge Lindsay and Judge Gertner and filed its motion for summary judgment based upon the discretionary function exception.  In the face of the rulings in Davis and in Limone, the government cannot argue that its persistence with asserting the discretionary function exception with its summary judgment motion and at trial was done in good faith.

The government's bad faith is magnified because at least some of the counsel in Hussey and Limone overlapped so those lawyers at the Department of Justice were well aware of the rulings in Limone.  Mary McElroy Leach, Assistant Director of the Torts Branch for the Department of Justice, was one of the trial counsel in Limone and she signed and argued the government's summary judgment motion on discretionary function in Hussey.  Attorney Bridget Bailey Lipscomb served as counsel in McIntyre, Limone and Hussey.  The lawyers from the Department of Justice, more than anyone, knew of the repeated rejection of their arguments on discretionary function and persisted without any basis in the law.

This Court (Young, J.) denied the United States' summary judgment motion, yet the government asserted the defense throughout trial.  No wording is more apt than that of Judge Young, which characterized the government's position on discretionary function as follows:

> Like Sisyphus rolling his rock uphill, the government again asserts that the discretionary function exception to the FTCA applies, despite having failed to convince the courts in <u>McIntyre</u> and <u>Limone</u> during motion practice, at trial, and on appeal, that this argument has merit . . . This provision does not apply, however, where the government's conduct was "unconstitutional, proscribed by statute, or exceeded the scope of the agent's authority."  (Citation omitted.)

<u>See</u> Memorandum of Decision and Order of Judgment dated January 29, 2010, p. 40.  The Honorable William G. Young also cited favorably to Judge Gertner's ruling in <u>Limone</u> on discretionary function quoted above and ruled the "same result obtains here." <u>Id</u>.

The defense of discretionary function permeated the trial and required the plaintiffs to call witnesses, including FBI agents Robert Fitzpatrick, Gerald Montanari, to refute the government's position.  In addition, much of the testimony of Stephen Flemmi dealt with his relationship with his various handlers, including Paul Rico and John Connolly, to expose the discretionary function as a nonsense defense advance in bad faith.  Likewise the plaintiffs had to introduce numerous exhibits into evidence to combat the United States' position on discretionary function.  The trial of this case would have been markedly shorter if not for the government's assertion that the discretionary function exception applied.

### D.      <u>THE BAD FAITH DEFENSE OF COMPARATIVE NEGLIGENCE</u>

The government blames the victim, Deborah Hussey, for her own murder and for good measure also claims her mother, Marion Hussey, was comparatively negligent for James Bulger strangling the life from her daughter.  The United States went out of its way to assert comparative negligence and amended its Answer to make sure these defenses were included.[6]

The two defenses are based on theories that Deborah Hussey and her next of kin had a duty to report allegedly known violent and criminal acts of Stephen Flemmi to law enforcement and that Deborah Hussey assumed the risk of being with Stephen Flemmi. While the Estate of Deborah Hussey disputes the knowledge imputed to Deborah Hussey and her relatives, as a matter or law neither defense is valid, even if they had any such knowledge.

Massachusetts law does not recognize a duty to report a crime to law enforcement person.  <u>Commonwealth v. Senior</u>, 454 Mass. 12 (2009) ("there was no legal obligation to report a crime to the police.")  As for the government's assumption of the risk defense, the comparative negligence statute, M.G.L. 231, §85, clearly states:  "The defense of assumption of risk is hereby abolished in all actions hereunder."  Therefore, no basis exists for the assumption of risk affirmative defense outlined in the United States'

---

[6]    **EIGHTEENTH DEFENSE**

At the time in question, plaintiff, and the next of kin of plaintiff's decedent, were guilty of negligence by reason of failure to use that degree of care that would have been used by ordinarily reasonable and prudent person under the same or similar circumstances, in that plaintiff and the next of kin of plaintiff's decedent were aware of the violent and criminal history and propensities of Stephen Flemmi but failed to take action to alert any law enforcement agency of those facts and otherwise failed to warn or protect plaintiff's decedent from the known risk of harm; and such negligence on the part of plaintiff and the next of kin of plaintiff's decedent caused, or contributed to, the damages complained of in plaintiff's complaint.

**NINETEENTH DEFENSE**

Whatever injuries were sustained by plaintiff's decedent or whatever damages were sustained by the next of kin of plaintiff's decedent, at the time and place alleged in the complaint, were the result of contributory negligence of plaintiff's decedent, in that plaintiff's decedent was aware of the violent and criminal history and propensities of Stephen Flemmi and yet failed to use reasonable care to notify law enforcement or to take reasonable care to protect herself from a known risk of harm; and such negligence on the part of plaintiff's decedent caused, or contributed to, the damages complained of in plaintiff's complaint.

nineteenth defense.  While the comparative negligence statute does permit reduction for

damages for the percentage of "negligence attributable to the person for whose . . . death

recovery is made," no theory in either defense is sustainable.

Deborah Hussey was murdered by Bulger and Flemmi in 1985 when she was

twenty-six years old.  See Exhibit 8.  Stephen Flemmi last lived with Marion Hussey in

1982.  (Trial testimony of Marion Hussey and Stephen Flemmi).  There was absolutely

no basis in the statute or in common law to impute comparative negligence to Deborah

Hussey or Marion Hussey.

This Court noted that the United States "never cited any legal authority in support

of this defense and failed to articulate any duty the Plaintiffs violated."  See

Memorandum of Decision and Order for Judgment dated January 29, 2010, p. 41.

Moreover, the Court recognized the frivolous nature of the defense when it wrote:  "The

government simply dreamt up a duty to self-preservation that the Plaintiffs allegedly

breached by fraternizing with known criminals.  There is no support for such a

proposition."  Id.  See also, "A Final Note" portion of the decision.  Id. at 51.  ("Here, the

government—our government—seriously argued . . . that the victims and their families

were somehow complicit in their own murders, well knowing no Commonwealth court

has ever suggested such a bizarre legal theory.")  In fact, until this Court intervened and

forced the government to put the brakes on its argument, the United States almost argued

that Debra Davis and Deborah Hussey were asking to be murdered.

This baseless attack on Deborah Hussey and her mother, Marion Hussey, is a

thinly veiled attempt to harass and embarrass Marion Hussey.  All one needs to examine

to determine the motivation of the government in alleging comparative negligence is its

opening statement:

> Even though she'll [Marion Hussey] testify, Flemmi molested
> both of her daughters, involved both of her sons in crime,
> supported her for over some 30 years in a mansion, a 20 room
> mansion with a pool, tennis court, cabana.  That's all blood money
> coming to her from Flemmi from his life of crime, and she comes
> in here says it's not my fault.  She protected, nurtured.  She
> washed his clothes after he cut the teeth out of al these people.

See Trial Transcript of July 1, 2009, p. 43, attached as Exhibit "A."  Such conduct should

not be tolerated by any party, especially by our own government.  The United States

acted in bad faith and with the intent to harass and embarrass Marion Hussey in violation

of both 28 U.S.C. § 2412 (b) and Fed. R. Civ. P. 11, and the Court should sanction the

defendant for its reprehensible behavior.

> **E.    LATE DISCLOSURE OF FLEMMI'S DEA-6 AND LISTS OF
> BRIBES TO LAW ENFORCEMENT AGENTS**

Unfortunately the government continued the pattern of not producing documents

that began with the Salemme hearings and continued in the other FBI cases of Limone,

McIntyre, and Castucci.  The lawsuit of the Estate of Deborah Hussey was joined for

discovery purposes with the McIntyre and Castucci and the United States never produced

the DEA-6 of Stephen Flemmi until after the April 14, 2009 conference before Judge

Young in which he instructed the government that nothing further could be filed under

seal.  The DEA-6, while not admitted into evidence, was still a vital document for the

plaintiff because it was a history of Stephen Flemmi's dealings with the FBI back to the

1960's, a virtual roadmap for the plaintiffs' cases.  See "E" marked for identification

during trial.  One DEA-6 debriefing report was completed on November 19, 2004, almost

five years before trial.  While the government lawyers had access to the DEA-6 and were

able to use the information contained in it for deposition questioning, the Estate of Hussey was denied that right.  So, too, with another DEA-6 debriefing report of Flemmi dated November 22, 2004 dealing with corruption of law enforcement agents.  See "F" marked for identification during trial.

Then there was another withheld document that the plaintiffs did not receive until halfway through trial, Flemmi's handwritten notes summarizing all the bribes to FBI agents and others.  The Court ordered those documents produced after hearing Flemmi's testimony.  See Exhibits 66 to 72.  One such document outlined $235,000 bribes to John Connolly.  See Exhibit 66.

In the Declaration of Daniel M. Doherty dated July 17, 2009, it is clear Flemmi's notes were long in the possession of the United States.  At paragraphs 3 and 4, Daniel Doherty explains the notes were not attached to the DEA report dated November 19, 2004, but that the notes were attached to a "Federal Bureau of Investigation 302 transcribed on June 16, 2004, [and that he] determined that a copy of the notes is also located in the United States Attorney's Office for the District of Massachusetts."  See Exhibit "B".  Flemmi's handwritten notes contain Bate Stamp numbers SF-3445 to SF-3463, presumably someone in the government labeled these under Stephen Flemmi ("SF") and placed the sequential Bate Stamp numbers on them.

Defendant United States acted in bad faith in withholding these documents, especially in light of the fact that there has always been a protective order in place in this case and the documents would remain confidential.  At every turn, starting before Judge Wolf, the government concealed documents and should be sanctioned for its action.

**F.**      **<u>REQUEST FOR ATTORNEY FEES for the ENTIRE LITIGATION</u>**

The Supreme Court has ruled that after establishing bad faith a party is entitled to attorney fees for work on the entire case.  <u>Commissioner v. Jean</u>, 496 U.S. 154, 161-162 (1990) ("Any given civil action can have numerous phases.  While the parties' postures on individual matters may be more or less justified, the EAJA-like other fee-shifting statutes-favors treating a case as an inclusive whole, rather than as atomized line items.") ("[A] fee award presumptively encompasses all aspects of the civil action.")  <u>Id</u>.  The government's prelitigation behavior that is the basis of the lawsuit can be considered in a bad faith determination.  <u>Rodriquez v. United States</u>, 542 F.3d at 12.  While such conduct cannot be the sole cause, it can be a factor.  Certainly the evidence overwhelming established that the FBI acted in bad faith in handling and protecting Bulger and Flemmi.

The award of attorney fees is based upon the market rate in the jurisdiction of the case.  <u>Blum v. Stenson</u>, 465 U.S. 886, 895 (1984).  The First Circuit has adopted the lodestar method for calculating attorney fees.  <u>Coutin v. Young & Rubicam P.R., Inc</u>., 124 F.3d 331, 337 (1st Cir. 1997).  Counsel for the Estate of Deborah Hussey, Ann M. Donovan, submits an affidavit with her attorney fees outlined in detail and support for her hourly rate of $300.00.  Based upon this affidavit the Court will be able to employ the lodestar method to determine an award of attorney fees.  This motion is timely filed within fourteen days of the Court's entry of judgment on February 3, 2010.

Wherefore, the Estate of Deborah Hussey given the totality of the circumstances respectfully requests that this Court enter an order that the United States of America pay attorney fees in the amount of $220,350.00 as a sanction for its bad faith conduct.  The Estate relies upon the Affidavit of Ann M. Donovan to support the amount requested.

PLAINTIFF
Estate of Deborah Hussey
By its attorney,

/s/ Ann M. Donovan
Ann M. Donovan
BBO # 552819
Law Office of Ann M. Donovan
1087 Beacon Street, Suite 204
Telephone:      (617) 965-3222
February 12, 2010                      Facsimile:      (617) 965-1069

## CERTIFICATE OF SERVICE

I, Ann M. Donovan, do hereby certify that the Memorandum Supporting the Estate of Deborah Hussey's Motion for Sanctions against the United States of America was filed on February 12, 2010, through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing ("NEF").

/s/ Ann M. Donovan
February 12, 2010                      Ann M. Donovan